**James Clarence MOORE, Appellant,**

**v.**

**Curtis REID et al., Appellees.**

**No. 13581.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1957.

Decided May 3, 1957.

Mr. Dayton M. Harrington, Washington, D. C. (appointed by the District Court), for appellant.

Mr. E. Tillman Stirling, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Edward P. Troxell, Principal Asst. U. S. Atty., and Lewis Carroll, Asst. U. S. Atty., were on the brief, for appellees.

Before EDGERTON, Chief Judge, and WILBUR K. MILLER and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Petitioner, having been sentenced to serve a three to nine year sentence for housebreaking, was conditionally released from Atlanta Penitentiary on July 16, 1955, after earning 1,038 days' "good time" credit. On December 20, 1955, he was arrested for violation of a condition of his release, and was imprisoned at once. Action upon his petition for a writ of habeas corpus was deferred upon the Government's representation that a Parole Board Examiner's hearing was about to be held, and the petition was dismissed after the Examiner had gone forward with his revocation hearing.

On appeal, we ordered a full hearing. The Government, in a supplemental return and answer to the original order to show cause, relied upon the Examiner's hearing, and further pleaded that the Parole Board's order of revocation was not arbitrary but was based upon substantial evidence of violation of the terms of appellant's conditional release. The present appeal attacks the order discharging the writ.

The District Judge set forth many pertinent facts in a careful opinion [1] which delineates the narrow scope of the review authority permitted to the courts in a situation of this kind. However correct the opinion as far as it went, we think it did not reach to the heart of the matter. Perhaps we should have been more specific in our earlier order of remand, but since we did not have the Transcript, we did not then inquire whether or not there had been infirmity in the hearing before the Examiner. We ordered a hearing at which the Transcript was to be received in evidence. It is now before us as we examine the record. "The primary purpose of a *habeas corpus* proceeding is to make certain that a man is not unjustly imprisoned. And if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief." [2]

In re Tate [3] noted that "the right of counsel is no less important in an administrative hearing on a revocation of parole, than it is in a judicial proceeding. This is well illustrated in the instant case. By the revocation of parole, the defendant becomes liable to imprisonment for an additional period of approximately 24 years. Surely, it is not unreasonable for him to ask for counsel to be heard and his evidence to be received."[4] The Government then appealed, pointing out that the federal au-

---

1. See Moore v. Reid, D.C.D.C.1956, 142 F. Supp. 481. The District Judge concluded:
   "Petitioner by his actions prior to revocation, his contemptuous attitude, and his disregard of his parole officer's supervision and the mail regulations of Atlanta Penitentiary, amply demonstrated that he was not willing to cooperate with the parole officer or to fulfill his obligations as a law-abiding citizen. Hence, the Parole Board did not act arbitrarily, but upon reasonable cause in revoking petitioner's conditional release." Id. at page 486.

2. Price v. Johnston, 1948, 334 U.S. 266, 291, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356.

3. D.C.D.C.1945, 63 F.Supp. 961, 964.

4. The statute there under consideration, D.C.Code 1940, § 24–206, provided in part that if a paroled prisoner shall be retaken, "he shall be given an opportunity to appear before said Board." Compare 18 U.S.C. § 4207: "A prisoner retaken upon a warrant issued by the Board of Parole, shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board."

thorities since 1910 had refused to permit counsel to appear or testimony to be offered at such hearings.

In Fleming v. Tate [5] we rejected the administrative practice. We pointed out that not only must an accused have an opportunity to appear before the Board, but that "a statute giving him a right to a hearing would seem to carry with it the right to representation." [6] We discussed the scope to be permitted to counsel and noted that the presence of counsel is a measure of protection to the prisoner and at the same time of assistance to the Board itself. We adopted with approval the reasoning which led to the granting of the writ. The District Judge had held that the section considered calls for "an effective appearance, and thus necessarily means the presence of counsel if the prisoner so elects, and the receipt of testimony if he has testimony to present." [7]

█ There is no record that the appellant here was advised of his right to elect to have his counsel present. [8] The stenographer who took notes of the hearing before the Examiner testified she had no recollection of the Examiner's offering counsel to the appellant or of the latter's request for one. Examiner Neagles did not testify. Appellant's claim has been that no "hearing" should go forward before the Examiner since he had filed his petition for habeas corpus in court. He testified: "So I immediately told him I wasn't ready for no hearing because I had a petition in Court and I wanted my lawyer to be present if I were going to have a hearing and he told me that was irrelevant to the fact, that was outside his jurisdiction, one was a legal matter and this was a parole procedure * * *." [9]

5. 1946, 81 U.S.App.D.C. 205, 156 F.2d 848.

6. Id., 81 U.S.App.D.C. at page 208, 156 F.2d at page 851.

7. Id., 81 U.S.App.D.C. at page 206, 156 F. 2d at page 849.

8. Following our opinion in Fleming v. Tate, the Act of July 17, 1947, 61 Stat. 378, D.C.Code 1951, § 24–206 amended the earlier section. It expressly provided:

"When a prisoner has been retaken upon a warrant issued by the Board of Parole, he shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board. At such hearing *he may be represented by counsel.* * * *

"In the event a prisoner is confined in, or as a parolee is returned to a penal or correctional institution other than a penal or correctional institution of the District of Columbia, the Board of Parole created by the Act of May 13, 1930 (ch. 255, 46 Stat. 272; 18 U.S.C. § 723a), shall have and exercise the same power and authority as the Board of Parole of the District of Columbia had the prisoner been confined in or returned to a penal or correctional institution of the District of Columbia." (Emphasis supplied.)

9. The minutes compiled by Examiner Neagles' stenographer show:

"Neagles: You are James C. Moore? I am James C. Neagles. I have been appointed Examiner for the United States Board of Parole to conduct this hearing with you regarding your conditional release violation. I wonder if you would like to tell me in your own words how you see your violation.

"Moore: First thing of all. Do we have to have a hearing now?

"Neagles: It is customary to grant a man a hearing after he has been arrested on his violation charge and given his viewpoint to the Board so the Board can decide to revoke or not.

"Moore: What I would like to do is postpone the hearing. Temporarily I have an injunction filed against the Board. After you read its content I would give you my side.

"Neagles: Are you referring to the writ [petition for habeas corpus] of which this is a copy?

"Moore: That is it.

"Neagles: The Board and I have read this writ and know the contents of it.

"Moore: (Yes sir)

"Neagles: And have made it a part of the record. Are you willing to have this hearing? This hearing will not have any bearing on the writ. Writ is a judicial proceeding, which is not a function of the Board of Parole.

"Moore: So far as the Board is concerned, I have nothing against the Board. Had its chairman been given the facts

We are satisfied that appellant made no election not to have counsel at the Examiner's hearing. We fail to see how his "election" can be said to bind him if he were not advised of his privilege. Nor does the record establish a waiver on his part. Indeed, the courts will indulge every reasonable presumption against waiver. While appellant had no constitutional right to counsel before the Examiner, he had a statutory right to such representation which he cannot be said to have waived unless there was an "intentional relinquishment or abandonment" of that "known right or privilege." [10] Though the Board need not assign counsel, it should make sure the prisoner knows "he may be represented by counsel." (Note 8 supra.)

We look next to the circumstances in which the lack of counsel looms so large. We do so against the background of the Court's observation:

"Prisoners are often unlearned in the law and unfamiliar with the complicated rules of pleading. Since they act so often as their own counsel in *habeas corpus* proceedings, we cannot impose on them the same high standards of the legal art which we might place on the members of the legal profession. Especially is this true in a case like this where the imposition of those standards would have a retroactive and prejudicial effect on the prisoner's inartistically drawn petition." [11]

In this very case, as part of the preface to appellant's personally prepared petition he said:

"I am no lawyer. But I do know that a man is privileged to make bond, even in some cases of murder, and since the Honorable Percy Richuson did not have the legal power to set me a bond, neither did he have the power to have me committed to

jail and keep me more than 72 hours, without having me brought before him to show cause why, and set me a bond. The Court will note that I have no knowledge of law and in view of the circumstances, I have no idea and knowledge of the legal profession. I am in hopes, that the Court will correct and protect my rights as an American citizen."

We quote in part and paraphrase other allegations that appellant "could and should not have been arrested" as a parole violator when he never had applied for or received a parole; that the warrant was not legal since it had been signed only by the Chairman of the Board, that it did not represent the action of four of the seven members and that Congress had given only to courts and commissioners the power to commit; that the parole officer told appellant he was being sent back to the Penitentiary for associating with criminals by writing to inmates in the Penitentiary whereupon "the petitioner laughed and told him, it was nonsense. * * * I asked him, how was writing to someone associating with them? I said, since you will not allow me to go directly to the Secretary or the Chairman of the Parole Board, and is going to send me back to the penitentiary, then I will take my case to a court here in Washington, D. C. and let the Judge decide upon it, whether I should be sented back or not? then I received the surprise of my life, he told me that the Federal Parole Board and its actions, was not subject to the Courts, Attorney General, Congress or the President of the United States, and I can not accepted his word in good faith."

If ever a lawyer were needed, it would seem that this appellant needed one. The inference is inescapable that appellant, under a complete misapprehension as to his status as a conditional releasee, failed

in the case there would have been no warrant issued in the first place. The Board got its facts from [Probation] Officers of the Board.
"Neagles: What are the facts?
"Moore: I sent mine down to court."

10. Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

11. Price v. Johnston, supra note 2, 334 U.S. at page 292, 68 S.Ct. at page 1063.

to appreciate the significance of the hearing before the Examiner or the extent of the latter's authority. Had appellant been advised by counsel, at the very least he would have been caused to understand the nature of the proceedings. Participation by counsel might have insured to the Examiner and hence to the Board, as well as the parolee, that the Board be accurately informed of all circumstances before it acted. Surely counsel could have undertaken to place in proper light the facts of record and the significance to be attributed to them. The record shows that the Examiner informed the appellant: "As I see it, the reason why your conditional release was violated was that you wrote to inmates at Atlanta using an alias after you were warned not to."

Thus, the record shows, the hearing or interview involved, in part, appellant's version of his relationship with one Green and certain correspondence to which reference will be made. That the discussion on these matters was significant and completely critical is beyond question.[12]

Certain other features now become relevant to an understanding of the total situation. While in prison appellant developed an interest in one Wilbert William Green, an inmate serving a sentence of some 13 to 39 years. Appearing before a notary public in the prison on October 6, 1954, appellant subscribed to an instrument attested by two witnesses, acknowledging that he "do here by adopted * * * Green, as my lawful and legal son, and that he will from hereon, enjoy all social and financial benefits of the family—Be it know that I am inclosed in both sound mind and body as I sit fourth my hands to sign this legal adoption."

Released from the prison on Saturday, July 16, 1955, appellant reported in Washington to the parole officer on Monday, July 18, 1955, and thereafter secured employment which he seems to have pursued steadily until his arrest the following December 20th. He presently visited Green's uncle and aunt, and under date of July 22, 1955, addressed a letter to Green reporting upon his interview with Green's relatives, and, also expressing his satisfaction that he had "adopted" Green when he did. He signed the letter "James H. Hicks, Uncle." It may be supposed that if Hicks had himself signed the letter it would have been delivered to Green. It was intercepted by the prison authorities, and on July 27, 1955, a parole officer sent for the appellant who inquired about the Hicks letter. He testified that Moore "admitted quite honestly that he had written such letter" and that he forbade the appellant from any further communications or attempted communications with Green or anyone else "or any association with anyone else, with a criminal record or a bad background, criminal background." In other efforts on Green's behalf, appellant communicated with the Director of the Bureau of Prisons, and apparently, with other officials.

Later, three postcards postmarked October 30, 1955, were intercepted by the authorities in Atlanta, one being addressed to Green, the others to two other inmates. Early in December these items were forwarded to the parole officer in Washington who, on December 10, interviewed the appellant concerning them. Appellant's attention was then specifical-

12. The Chairman of the Parole Board testified that the charges which constituted the basis of the revocation of appellant's conditional release were:

"Attempted fraud by misrepresentation in correspondence and circumventing mail regulations in a Federal institution. He also misrepresented his relationship to Wilbert Green. Those were the principal considerations. It was felt that a person who did that was not living honorably. His failure to clarify the situation or his claim that Green was his adopted son was not answering questions truthfully and that his attempted correspondence amounted to association with persons having a criminal background or attempt to associate with those persons."

ly directed to one of the conditions of the appellant's conditional release which reads:

> "12. That I will not associate with persons having a criminal background, bad reputation, or those engaged in questionable occupations."

It seems clear from the record that appellant was at a loss to understand how forwarding the intercepted mail could be construed as an association with persons having a criminal background. Following the interview, and as an aftermath to the discussion concerning the true import of the quoted condition, the parole officer recommended the issuance of an arrest warrant.[13]

We are prepared to say, whatever else the language may mean, it is not legally susceptible to the interpretation that the sending of the intercepted communications constituted an association with improper persons. The parole officer's misconstruction of the condition became the certain cause of the entire impasse.[14]

The record shows that within the first day or two of each and every month, the appellant had regularly reported, as required, at the office of the parole officer. Except for the undelivered mail, there is no suggestion in the record that he "associated" with criminals. He worked steadily, prepaid his room rent, bought a radio and television, new clothes and other creature comforts. There is no evidence that he got into "trouble." Indeed, in the latter part of November, the pa-role officer even gave him permission to travel to New York. Then, on December 20, a man who had responded to every summons was arrested while at work. The marshal and several deputies delivered him to the jail. Denied the privilege of returning to his room to protect his belongings or even to collect his pay, he then penned and forwarded from the jail to the court his petition for the writ.

We have supplied certain details as to the background for the revocation proceedings, not that our summary is intended to be complete, but merely to demonstrate that had there been counsel at the "hearing" before the Examiner, much could have been said and done to insure the Board's complete understanding of the problem. Thus the lack of counsel in this setting became critical. We have an abiding conviction that such lack deprived this particular appellant of his effective "opportunity to appear before the Board." We are satisfied that Congress in adopting the statute, and the Code, as amended, following our opinion in Fleming v. Tate, supra, had in mind that years of a man's life are not to be spent behind prison bars without his being given the right to elect to have representation by counsel. When the statute says a paroled prisoner "shall" be given an opportunity to appear before the Board, "it is the language of command."[15] and that appearance includes counsel if the prisoner so elect.

13. Meantime, appellant's efforts in Green's behalf culminated in a letter dated November 15, 1955, from Mr. James V. Bennett, Director of the Bureau of Prisons. The latter acknowledged appellant's "recent letter in a further effort to effect the transfer" of Green to the Reformatory at Lorton, Virginia. "It has also come to my attention that the Warden [Hardwick] has advised you regarding correspondence with Mr. Green and that no exchange will be permitted. Although your interest in Mr. Green's welfare is appreciated, I trust you will be co-operative and conform to institutional regulations." Appellant accepted the Director's admonition, immediately acknowledged his letter and gave assurances of compliance. Word from the Director was regarded as "official" as distinguished from the parole officer's interpretation upon which the December 10th interview turned. At the hearing before the Examiner appellant promised he "wouldn't write to anyone Mr. Bennett asked me not to." As noted, the postcard incident antedated the Bennett letter.

14. The parole officer later testified that he suspected that appellant, though a regularly employed laundry worker in Washington, might be laying the foundation for a prison break at Atlanta.

15. Escoe v. Zerbst, 1935, 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566; compare id. at 494, and 820 respectively where, under other circumstances, to be sure, and a different statute, the proceedings were held to be void.

■ We do not reverse in order to substitute our judgment for that of the Board. We have no such power. When, however, it does not appear that the prisoner knew that at the hearing "he may be represented by counsel," there was neither election not to have counsel nor a waiver. Since the absence of counsel became critical as we have shown, the Examiner's hearing became fatally invalid.

The appellant is entitled to be discharged from his confinement.

Reversed.