318 F.2d 225
 Robert E. HYSER, Appellant,
v.
George J. REED, Chairman, United States Board of Parole, Appellee.
John Thomas JATOFT, Appellant,
v.
R. A. CHAPPELL, Chairman, United States Board of Parole, et al., Appellees.
James Charles WHITLING, Appellant,
v.
George J. REED, Chairman, United States Board of Parole, et al., Appellees.
Robert THOMPSON, Appellant,
v.
UNITED STATES BOARD OF PAROLE et al., Appellees.
John T. NEISWENTER, Jr., Appellant,
v.
Richard A. CHAPPELL, Chairman, United States Board of Parole, et al., Appellees.
Andrew Louis FITZPATRICK, Appellant,
v.
Richard A. CHAPPELL, Chairman, United States Board of Parole, et al., Appellees.
William Francis LeRoy WILLIAMSON, Appellant,
v.
Richard A. CHAPPELL, Chairman, United States Board of Parole, et al., Appellees.
Larry T. JAMISON, Appellant,
v.
Richard A. CHAPPELL, Chairman, United States Board of Parole, et al., Appellees.
 No. 16716.
 No. 16806.
 No. 16811.
 No. 16873.
 No. 17041-17043.
 No. 17059.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 24, 1962.
 Decided April 11, 1963.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Mr. James H. Heller, Washington, D. C. (appointed by this court for appellant in No. 16873), argued for appellants in Nos. 16716, 16806, 16811, 16873.
 
 1
 Mr. Lawrence Speiser, Washington, D. C., with whom Messrs. David B. Isbell and Robert J. Muth, Washington, D. C. (all appointed by this court), were on the brief for appellants in Nos. 17041, 17042, 17043, 17059. Messrs. Richard S. Arnold and Mark A. Weiss, Washington, D. C., were also on the brief for appellants in Nos. 17041, 17042, 17043, 17059.
 
 
 2
 Mr. Harold H. Greene, Atty., Dept. of Justice, with whom Asst. Atty. Gen., Burke Marshall, Messrs. David C. Acheson, U. S. Atty., and Alan G. Marer, Atty., Dept. of Justice, were on the brief, for appellees in Nos. 16716, 16806, 16811, 16873.
 
 
 3
 Mr. David Rubin, Atty., Dept. of Justice, of the bar of the Court of Appeals of New York, pro hac vice by special leave of court, with whom Asst. Atty. Gen. Burke Marshall, Messrs. David C. Acheson, U. S. Atty., and Harold H. Greene, Atty., Dept. of Justice, were on the brief, for appellees in Nos. 17041, 17042, 17043, 17059.
 
 
 4
 Mr. Herbert M. Schulkind, Washington, D. C. (appointed by this court), was on the brief for appellant in No. 16716. Mr. Lawrence Speiser, Washington, D. C., filed a memorandum on behalf of appellant in No. 16716 as amicus curiae.
 
 
 5
 Mr. Geoffrey Creyke, Jr., Washington, D. C. (appointed by this court), was on the brief for appellant in No. 16806. Mr. H. Randall Bixler, Washington, D. C., also entered an appearance for appellant in No. 16806.
 
 
 6
 Messrs. Greene C. Furman and Elbert E. Blakely, Washington, D. C., (both appointed by the District Court), were on the brief for appellant in No. 16811.
 
 
 7
 Messrs. Patrick A. McDonald and John A. Yacovelle, Jr., Washington, D. C., (both appointed by the District Court), were on the brief for appellant in No. 16873.
 
 
 8
 Before BAZELON, Chief Judge, and EDGERTON, WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER and WRIGHT, Circuit Judges, sitting en banc.
 
 
 9
 BURGER, Circuit Judge, with whom WILBUR K. MILLER, WASHINGTON, DANAHER and BASTIAN, Circuit Judges, concur.
 
 
 10
 These cases arise from parole revocation proceedings and have been consolidated for en banc consideration by the court inasmuch as the basic questions are common to all the appeals. Each appellant was ably represented by court appointed counsel in the District Court and in this court.
 
 Hyser v. Reed, No. 16716
 
 11
 Hyser was convicted of violation of the National Motor Vehicle Theft Act and the Marihuana Tax Act and was sentenced to a term of ten years imprisonment, on December 17, 1952. He was mandatorily released on March 5, 1959 from the United States Penitentiary, Leavenworth, Kansas. On November 18, 1959, he was arrested as a mandatory release violator and returned to Leavenworth Penitentiary. He had a hearing before a member of the United States Parole Board on January 12, 1960, but was not afforded the opportunity to be represented by counsel. His mandatory release was revoked on February 26, 1960. On May 10, 1961, following our holding in Glenn v. Reed, 110 U.S.App. D.C. 85, 289 F.2d 462 (April 7, 1961), he was offered a new hearing with counsel present. He did not accept the offer and filed a declaratory judgment action seeking his release. Summary judgment was granted in favor of the Parole Board, and Hyser appealed. The record does not reveal what condition of parole Hyser was found to have violated, nor does Hyser's complaint contain allegations denying violation of a condition of parole.
 
 Jatoft v. Chappell, No. 16806
 
 12
 Jatoft was convicted of kidnapping and transporting a stolen vehicle in interstate commerce and was sentenced to a term of twenty years imprisonment, on June 27, 1947. He was released on parole, June 6, 1956, from the United States Penitentiary, Atlanta, Georgia. On February 25, 1959, he was arrested on a parole violator warrant and on March 9, 1959, had a hearing before a member of the Parole Board at the Federal Detention Headquarters in New York City. At the hearing Jatoft was not advised of his right to have counsel and did not have the assistance of counsel. His parole was revoked on May 5, 1959. The violations of parole conditions upon which the Board relied to revoke Jatoft's parole were association with one Brando, a person with a criminal record, and involvement with Brando in a scheme to defraud a department store by returning stolen goods for cash refunds. Before a representative of the Board, Jatoft admitted returning merchandise to the department store which involved the forging of names on credit slips. He denied knowledge of Brando's criminal record. On May 15, 1961, after the decision in Glenn v. Reed, supra, he was offered a new hearing with the right to retain counsel, but he refused the offer and instituted a declaratory judgment action seeking his release. Summary judgment was granted in favor of the Parole Board and Jatoft appealed.
 
 Whitling v. Reed, No. 16811
 
 13
 On June 18, 1957, Whitling was committed to the custody of the Attorney General under the provisions of the Federal Youth Corrections Act, 18 U.S.C. § 5010(b) (1958). He was released on parole on June 20, 1959. On June 13, 1960, he was arrested on a parole violator warrant. He was afforded a hearing by the United States Board of Parole, on August 24, 1960, at the Federal Reformatory at Chillicothe, Ohio, but did not have assistance of counsel nor was he advised of his right to retain counsel. His parole was revoked on October 5, 1960. Appellant filed a declaratory judgment action in the District Court on March 1, 1961. Subsequent to Glenn v. Reed, supra, the Parole Board offered him a new revocation hearing with the right to retain counsel, which appellant refused. Summary judgment was granted in favor of the Parole Board in the declaratory judgment action and Whitling appealed. Whitling's complaint does not contain allegations denying violation of condition of parole. Subsequent to judgment, however, Whitling asked leave to file an amended complaint which alleged that he had admitted violation of parole only as a result of coercion and threats, apparently allegedly made by representatives of the Parole Board. The District Court denied leave to file the amended complaint.
 
 
 14
 Thompson v. United States Board of Parole, No. 16873
 
 
 15
 Thompson was convicted of homicide by a General Court Martial while he was in service on June 22, 1945, and was sentenced to life imprisonment. Subsequently the Army Clemency Board reduced the sentence to a term of twenty-eight years. He was released on parole on May 31, 1955, and was authorized to reside in the Bridgeport, Connecticut, district. On July 12, 1960, Thompson left his authorized parole district without permission. The same day he was arrested on a concealed weapons charge by New Jersey state authorities. He was tried and convicted of the weapons offense in a New Jersey state court and served a two month jail sentence. A parole violator warrant was issued for the retaking of appellant on August 25, 1960, and he was arrested under this warrant on November 10, 1960, upon his release from a New Jersey state jail, and was returned to the Federal Penitentiary at Lewisburg, Pennsylvania. Thompson admitted violation of parole. He was afforded a hearing by a member of the Parole Board on February 7, 1961, but was not afforded the assistance of counsel nor advised of his right to counsel. His parole was revoked on March 14, 1961. On May 3, 1962, after Reed v. Butterworth, 111 U.S.App.D.C. 365, 297 F.2d 776 (Nov. 9, 1961), he was offered a new hearing with the right to retain counsel and present voluntary witnesses, which he refused. Appellant filed a declaratory judgment action seeking his release and summary judgment was granted in favor of the Parole Board. Thompson appealed.
 
 Neiswenter v. Chappell, No. 17041
 
 16
 Neiswenter was convicted of mail theft and forgery and was sentenced to a term of ten years imprisonment, on July 17, 1953. He was mandatorily released on October 23, 1959. On September 18, 1960, he was arrested on a mandatory release violator warrant and was returned to the Federal Penitentiary at Lewisburg, Pennsylvania. On September 30, 1960, he was interviewed by a case-worker at the Penitentiary, and was informed of the charges against him, which included theft, loss of employment due to absenteeism, leaving his authorized parole district without permission, contributing to the delinquency of a minor, breaking, entering and larceny. He admitted all of the charges except the charge of theft. He had a hearing before a member of the Parole Board on November 7, 1960, but was not given the opportunity to retain counsel. His mandatory release was revoked on January 6, 1961. Neiswenter filed a declaratory judgment action in the District Court seeking his release from custody on March 30, 1961. On May 2, 1961, after Glenn v. Reed, supra, the Board offered a new hearing with the opportunity to retain counsel, which he declined. On December 1, 1961, after Reed v. Butterworth, supra, he was offered another hearing at which he would have been allowed to retain counsel and present witnesses in his behalf who would appear voluntarily. He declined the offer. Summary judgment was granted in favor of the Board of Parole in the declaratory judgment action on January 3, 1962, and Neiswenter appealed.
 
 Fitzpatrick v. Chappell, No. 17042
 
 17
 Fitzpatrick was convicted of impersonating an Army officer and obtaining money under false pretenses in violation of 18 U.S.C. § 912 and transporting forged checks in interstate commerce and was sentenced to a total term of ten years imprisonment on April 16, 1951. He was released on parole on October 15, 1954. On October 27, 1957, he was arrested on a parole violator warrant and returned to the Federal Penitentiary at Atlanta, Georgia. On December 14, 1959, he was interviewed by the Chief of Classification and Parole of the Atlanta Penitentiary, was informed of the charges against him, which included failure to maintain contact with the parole office, leaving his authorized parole district without permission and issuing bad checks. He admitted that he violated the conditions of his parole. On February 12, 1960, he had a hearing before a member of the Board of Parole, at which time he was not represented by counsel nor advised of his right to retain counsel. His parole was revoked on May 2, 1960. Fitzpatrick instituted a declaratory judgment action in the District Court seeking his release from custody, on May 10, 1961. A part of the relief requested was a declaration that his sentence expired April 16, 1961, and as a result he would not be subject to rearrest as a parole violator if he was released because of improper hearing by the Parole Board. On May 16 and June 26, 1961, after Glenn v. Reed, supra, he was offered a new hearing by the Board at which time he could be represented by retained counsel. He refused the offer. On November 30, 1961, after Reed v. Butterworth, supra, he was offered a new hearing at which he would have been entitled to be represented by retained counsel and to present witnesses who would testify in his behalf voluntarily. He refused the offer. On January 3, 1962, summary judgment was granted in favor of the Parole Board in the declaratory judgment action and Fitzpatrick appealed.
 
 Williamson v. Chappell, No. 17043
 
 18
 Williamson was sentenced on September 17, 1953, to a term of ten years in the custody of the Attorney General. On January 28, 1960, he was released on parole from the Federal Correctional Institution at La Tuna, Texas. On November 5, 1960, a parole violator warrant was issued for his arrest and he was retaken on January 4, 1961, and was confined in the Leavenworth Penitentiary. On January 13, 1961, he was interviewed by a parole officer and informed of the charges against him, which included leaving his authorized parole district without permission and issuing worthless checks. He admitted leaving the district without permission and denied issuing the worthless checks. On January 28, 1961, Williamson had a hearing before a member of the Board of Parole but was not advised of his right to counsel. Parole was revoked on March 10, 1961. On May 5, 1961, after Glenn v. Reed, supra, he was offered a new hearing with the right to retain counsel, which he refused. He filed a declaratory judgment action in the District Court seeking his release. On December 1, 1961, after Reed v. Butterworth, supra, he was offered a new hearing at which he could be represented by retained counsel and could present witnesses in his own behalf who would appear voluntarily. He refused the offer. Summary judgment was granted in favor of the Parole Board in the declaratory judgment action and Williamson appealed.
 
 Jamison v. Chappell, No. 17059
 
 19
 Jamison was convicted July 21, 1945, of transporting a stolen motor vehicle in interstate commerce and was sentenced to a total term of fifteen years imprisonment. On January 26, 1951, he was released on parole. On January 25, 1957, a parole violator warrant was issued for his arrest and he was retaken on April 1, 1957, and delivered into the custody of the warden of the Federal Penitentiary at Leavenworth, Kansas. He was afforded a hearing before a member of the Board of Parole. Although Jamison had retained an attorney to represent him at the hearing, the Board member refused to allow counsel to appear. Jamison's wife who came to the hearing to testify was not allowed to do so. The charges of violation of conditions of parole included leaving his authorized parole district without permission, associating with persons having a criminal background, passing worthless checks, burglary and robbery. At the hearing Jamison denied all charges against him. On June 5, 1957, his parole was revoked. On May 9, 1961, after Glenn v. Reed, supra, Jamison was offered a new hearing at which he could be represented by retained counsel. He refused the offer apparently on the ground that he was indigent at that time and could not pay his own counsel fee. On May 22, 1961, he filed a declaratory judgment action in the District Court seeking release. As a part of the relief, he requested a declaration that if he is released from custody because of the improper hearing that he not be subject to arrest on a violator warrant because his sentence time has run. On December 1, 1961, after Reed v. Butterworth, supra, he was offered a new hearing where he could be represented by retained counsel and present witnesses in his own behalf who agreed to appear voluntarily. He refused the offer. At the hearing on motions for summary judgment the District Court ordered the Board of Parole to hold the hearing which Jamison had refused. The hearing was held before a member of the Board of Parole in Washington, D. C. Jamison was represented at the hearing by counsel appointed by the District Court in the declaratory judgment action, though the appointment did not include this duty. On March 2, 1962, Jamison's parole was revoked. On March 8, 1962, summary judgment was granted in favor of the Parole Board and Jamison appealed.
 
 Proceedings Before The Board
 
 20
 In none of these cases were the appellants advised at the time of the hearing that they had a right to have retained counsel present at the revocation hearing, and counsel did not appear in their behalf. Nor were any of the appellants informed that they could present the testimony of voluntary witnesses, and such testimony was not presented. However as we have noted all these hearings occurred prior to our decisions in Glenn v. Reed[1] or Reed v. Butterworth.[2] Subsequent to the Glenn decision, in April, 1961, each appellant was advised of his right to have retained counsel present at a revocation hearing and a new hearing was offered, and in December 1961, following the Butterworth holding, each appellant except Thompson[3] was advised that at a new hearing testimony of voluntary witnesses could be presented. Each appellant declined to sign statements accepting the proffered hearing, but elected instead to file suit for declaratory judgment in the District Court seeking immediate release from confinement. Each appeal is from summary judgment granted in favor of the government.
 
 Contentions on Appeal
 
 21
 The claims for release by these appellants are predicated on the ground that the revocation steps taken by the United States Parole Board were void and illegal. In essence appellants claim they are entitled to a revocation hearing before the Board which includes
 
 
 22
 (a) appointed counsel for indigents,
 
 
 23
 (b) specification of charges,
 
 
 24
 (c) confrontation and cross examination of the Board's informants,
 
 
 25
 (d) right to examine confidential reports of the Board,
 
 
 26
 (e) compulsory process to obtain witnesses, and
 
 
 27
 (f) a hearing held in the district where the alleged parole violation occurred.
 
 
 28
 In essence it is urged that except for a jury, parolees must be given virtually the full due process safeguards of a criminal prosecution before the Board can revoke parole. The due process argument rests on the contention that because the Board has discretionary power to deny parolees credit toward their sentences represented by the time spent on parole, it deprives them of liberty in a constitutional sense. It is clear that a citizen must be given a criminal trial to ascertain his guilt of a crime in the first instance before a penalty may be imposed, but the question before us is: Does constitutional due process require the Parole Board to conduct adversary hearings in the nature of a non-jury criminal trial in order to revoke parole of a person whose guilt of crime has already been determined in a criminal trial? Appellants' contentions require us to decide whether the procedural safeguards urged are commanded (a) by the statutes creating the Parole Board, (b) by the Administrative Procedure Act, (c) by the Constitution.
 
 Background of Parole System
 
 29
 In order to set the appellants' claims in context, it is necessary to outline the procedures presently followed by the Board and to keep in mind the underlying purposes of parole. The United States Parole Board was established by Congress to administer the parole system as a part of the program to rehabilitate federal prisoners and restore them to useful membership in society. 18 U.S.C. §§ 4201-4207.[4] The rehabilitation program of the Bureau of Prisons includes vocational training, education and the operation of industries by Federal Prison Industries, Inc., in which useful skills can be learned and developed and the prisoners benefited from participation in productive activity for which they are paid. 18 U.S.C. §§ 4121-4128. Inducements to rehabilitation are also held out in the form of deductions from the sentence based on work record and general behavior. 18 U.S.C. §§ 4161-4166. At a point the prisoner may be afforded an opportunity to serve part of the sentence outside the prison on parole — conditional release under supervision and restrictions but with liberty not otherwise impaired. 18 U.S.C. §§ 4164, 4203. Violation of a condition of parole can lead to arrest, return to prison and revocation of parole. 18 U.S.C. §§ 4205-4207. Thus a federal prisoner may come in contact with the exercise of the Board's discretionary powers on two occasions: first when parole is granted and second when and if parole is revoked. While on parole, he is in frequent contact with the Board's field representative, the parole officer.
 
 
 30
 The general category of parolees can be broken down into two distinct groups: mandatory releasees and parolees. Mandatory releasees are those prisoners who have served their sentences less a credit for good behavior, 18 U.S.C. § 4161, and for industrial or employment performance "good time," 18 U.S.C. § 4162. When a prisoner has served his sentence less his good time credit he is entitled, as a matter of right, to be released. 18 U.S.C. § 4163. This type of prisoner release is based on an arithmetical computation; there is no discretion in the Bureau of Prisons to deny release.[5] A mandatory releasee does not achieve absolute freedom upon release from prison. For a period of time equal to his good time allowance less 180 days, the mandatory releasee is treated as if he were released as a parolee and is subject to supervision by the United States Parole Board. 18 U.S.C. § 4164 (1958 ed. Supp. II).
 
 
 31
 Unlike a mandatory releasee, a parolee gains his conditional freedom as the result of the exercise of discretion by the Parole Board. After a federal prisoner has served a prescribed portion of his sentence, 18 U.S.C. §§ 4202, 4208, he may apply for parole. 18 U.S.C. § 4203; Parole Board Directive No. 1, § 2.12, 27 Fed.Reg. 8488 (August 24, 1962). Each applicant for parole is given a hearing before a member of the Board or an examiner, at the federal prison where he is incarcerated. If he is serving a term of more than one year he is entitled to appear at the hearing in person. Parole Board Directive No. 1, § 2.15, supra at 8489. The hearing officer is required to make a report of the interview and a recommendation to the Board. In reaching its decision the Board considers the report, the recommendation of the examiner and all information concerning the prisoner, gathered from recommendations, if any, of the sentencing judge, from the Federal Bureau of Investigation, prison and social agencies. Parole Board Directive No. 1, § 2.14, supra at 8488. On the basis of this information the Board is empowered to apply a broad congressional standard. The Board may grant parole when it is of the opinion "there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws" and upon "such terms and conditions * * * as the Board shall prescribe." 18 U.S.C. § 4203. Implicit in the term "reasonable probability" is a recognition that the Board will err sometimes in granting conditional release with the result that the prisoner must be returned to custody to serve his unexpired term. The Board's discretion to grant, deny or revoke parole is broad. Congress has granted the Board power to revoke a conditional release upon determining that a condition of the parole has been violated.[6]
 
 
 32
 This first contact between a prisoner and the Board which leads either to the initial grant of or denial of parole is not in issue in this case. We mention it only to indicate the procedure that is followed by the Board. At this stage the contact between prisoner and Board includes none of the incidents or procedural safeguards which attend a criminal trial because the Board, at this stage, must evaluate the prisoner's record as a whole to determine whether he is a good risk for parole; if he is thought to be a good risk, he is released on parole.
 
 
 33
 The relationship of the parolee and the Board beginning with this period of conditional release may be described as the supervisory or regulatory period. During the period of parole, the prisoner on conditional liberty is subject to the supervision of the Board acting through a federal parole officer. 18 U.S.C. § 3655; Dept. of Justice Order 271-62, § 0.126 (b), 27 Fed. Reg. 5172 (June 1, 1962). The premise of this phase of the rehabilitation process is that the prisoner has reached a point where further incarceration would not yield greater rehabilitation and the prisoner has progressed to a stage where he is believed to be ready to return to society subject to minimal supervision. If a parolee thereafter meets all the conditions of his parole he gains absolute freedom on the date when his sentence would have terminated. In other words, the parole time is credited against his total sentence in much the same manner as good time allowances are given to prisoners. However, if a parolee violates a condition of parole the conditional release may be revoked.
 
 
 34
 It is the revocation stage with which we are concerned in these appeals. If the Board finds that a parolee has violated a condition of his parole, it may revoke parole and return the parole violator to prison where he will "be required to serve all or any part of the remainder of the term for which he was sentenced." 18 U.S.C. § 4207. Stated in another way, the Board has the power to return the parole violator to prison and refuse to allow him credit toward the service of his sentence for the time spent on parole.
 
 
 35
 * The Parole Statute
 
 
 36
 Appellants recognize that the parole statute, 18 U.S.C. §§ 4201-4210, is silent on the procedural safeguards which they now claim. They do not take the position that the words "opportunity to appear before the Board" in 18 U.S.C. § 4207, comprehend all of the claimed safeguards. We have construed those words to permit parolees to be represented by retained counsel, Glenn v. Reed, supra, and to present voluntary witnesses, Reed v. Butterworth, supra.
 
 
 37
 From our review of the nature and purposes of parole it can be seen that appellants are neither totally free men who are being proceeded against by the government for commission of a crime, nor are they prisoners being disciplined within the walls of a federal penitentiary. They stand somewhere between these two. A paroled prisoner can hardly be regarded as a "free" man; he has already lost his freedom by due process of law and, while paroled, he is still a convicted prisoner whose tentatively assumed progress towards rehabilitation is in a sense being "field tested." Thus it is hardly helpful to compare his rights in that posture with his rights before he was duly convicted.
 
 
 38
 The legal proceeding most comparable to revocation of parole is revocation of probation. The Supreme Court has considered claims by probationers that they be accorded full dress hearings by the District Court before revocation and in each instance the Court has rejected the claim. Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932). In Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935) Justice Cardozo, speaking for the Court, said:
 
 
 39
 "Clearly the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation. * * This does not mean that he may insist upon a trial in any strict or formal sense. * * * It does mean that there shall be an inquiry so fitted in its range to the needs of the occasion as to justify the conclusion that discretion has not been abused by the failure of the inquisitor to carry the probe deeper."
 
 
 40
 In Williams v. People of State of New York, 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949), the Court (per Justice Black) dealing with the use by a sentencing judge of probation reports in making the choice between a death sentence and life imprisonment said:
 
 
 41
 "We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if the information were restricted to that given in open court by witnesses subject to cross-examination. * * *
 
 
 42
 "The type and extent of this information [probation reports] make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues. * * * The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure."
 
 
 43
 See Williams v. State of Oklahoma, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959).
 
 
 44
 While there are distinguishing factors between probation and parole, the underlying purposes are closely allied. In each the entity which grants is the entity which is empowered to revoke. In each situation the revoking authority is being exercised pursuant to explicit statutory authority.[7] Moreover that power is being exercised by a person or persons experienced in sifting and weighing evidence and evaluating the factors involved in the grant or revocation of conditional freedom. Congress, which is the source of both of these penological devices has given no indication that the revocation of parole should be more difficult or procedurally different than revocation of probation.
 
 The Administrative Procedure Act
 
 45
 Appellants next urge that various sections of the Administrative Procedure Act, 5 U.S.C. §§ 1004-1006, apply to revocation proceedings before the Board and as such guarantee to them the various safeguards which were denied them. In order for these sections of the Administrative Procedure Act to be applicable to the Parole Board, the Board must fit the description of 5 U.S.C. § 1004: "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing * * *."
 
 
 46
 These words limit coverage of the Administrative Procedure Act to agencies which are required by their own statute of creation to adjudicate, after hearing. Our conception of the functions of the Board, discussed in this opinion, leads us to the conclusion that the Board does not adjudicate, nor is it required to hold hearings, in the sense that those words are employed in the Administrative Procedure Act.[8]
 
 
 47
 Suffice it to point out with regard to appellants' claim to appointed counsel, that the Administrative Procedure Act, 5 U.S.C. § 1005(a), if it were held to apply, provides only that a person compelled to appear before an agency "shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." Thus the Administrative Procedure Act does not require appointment of counsel for an indigent. The parole statute, 18 U.S.C. § 4207, construed by this court in Glenn v. Reed, supra, provides for the right to be represented by retained counsel when appearing before the Board on revocation of parole.
 
 The Constitutional Claims
 
 48
 In view of the sweeping constitutional contentions for an adversary type hearing we will deal with each point separately.[9] Preliminarily, we note that the various safeguards to which the appellants say they are entitled are essentially those established by the Sixth Amendment. The appellants do not explicitly urge, nor would we accept the contention that the Sixth Amendment applies to parole revocation proceedings. The Sixth Amendment by its terms governs only "criminal prosecutions." Counselman v. Hitchcock, 142 U.S. 547, 563, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). Compare Levine v. United States, 362 U.S. 610, 616, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) and Strickland v. United States, 114 F.2d 556 (4th Cir. 1940). But appellants urge that the various elements of the Sixth Amendment relating to venue, notice of charge, confrontation, compulsory process for witnesses and right to counsel, are included in the due process restrictions of the Fifth Amendment as they apply to actions of the Parole Board.
 
 
 49
 The Bureau of Prisons and the Parole Board operate from the basic premise that prisoners placed in their custody are to be rehabilitated and restored to useful lives as soon as in the Board's judgment that transition can be safely made. This is plainly what Congress intends. Thus there is a genuine identity of interest if not purpose in the prisoner's desire to be released and the Board's policy to grant release as soon as possible. Here there is not the attitude of adverse, conflicting objectives as between the parolee and the Board inherent between prosecution and defense in a criminal case. Here we do not have pursuer and quarry but a relationship partaking of parens patriae. In a real sense the Parole Board in revoking parole occupies the role of parent withdrawing a privilege from an errant child not as punishment but for misuse of the privilege. "Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders." Williams v. People of State of New York, 337 U.S. at 249, 69 S.Ct. at 1084. Perhaps the more correct view is that retributive justice is satisfied by the conviction whereas the sentence is a process of treatment. It is important to bear this in mind in determining whether there would be any gain to the parolee or to society in taking steps urged by the dissenting opinions which tend to equate parole processes with criminal prosecutions.
 
 
 50
 Appointed Counsel: Appellants concede that Congress has not authorized the Parole Board to appoint counsel for indigent parolees appearing before it and that Congress has not empowered the federal courts to make such appointments. The decisions of this court which hold that the parolee must be advised of his right to have retained counsel present are based on judicial construction of the words "opportunity to appear before the Board" in 18 U.S.C. § 4207. Glenn v. Reed, 110 U.S.App.D.C. 85, 289 F.2d 462 (1961); Robbins v. Reed, 106 U.S.App. D.C. 51, 269 F.2d 242 (1959). Cf. Moore v. Reid, 100 U.S.App.D.C. 373, 246 F.2d 654 (1957); Fleming v. Tate, 81 U.S. App.D.C. 205, 156 F.2d 848, affirming In re Tate, 63 F.Supp. 961 (D.D.C. 1946). They do not stand for the proposition that the presence of counsel is mandatory whenever a parolee appears before the Board or that parole revocation proceedings were to become adversary proceedings.
 
 
 51
 In Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962), the Supreme Court did not place an indigent's right to counsel and a free transcript in judicial proceedings on any command of the Constitution, but more narrowly on its interpretation of a statute, 28 U.S.C. § 1915. No case has yet held that an interested party in an administrative or regulatory proceeding is entitled to be furnished with counsel if he cannot afford one of his own choice.
 
 
 52
 We hold due process does not require that indigent parolees be provided with appointed counsel when they appear before the Parole Board in revocation proceedings.
 
 
 53
 Confrontation and Cross Examination: Appellants claim that due process in the context of a parole revocation requires that they be allowed to cross-examine the informants who supplied the Board with information on which revocation is based. The parole revocation process is neither a "criminal prosecution" nor an adversary proceeding in the usual sense of that term. The primary issue before the Board is: Has the parolee violated a condition of his parole? Even if this determination is adverse to the parolee the Board has discretion to continue his parole notwithstanding a violation. In accord with this generally accepted view of the nature of parole as an integral part of the rehabilitation process, we hold that due process does not require the Board to allow cross-examination of its sources of information in parole revocation proceedings. See Williams v. New York, supra.
 
 
 54
 Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), relied on by appellants, does not require that the Board produce its informants for cross-examination by a prisoner charged with parole violation. The Greene case held that absent clear congressional authorization the Department of Defense could not establish a security clearance program for employees of private employers engaged in performing government contracts where security clearance and hence continued employment could be denied without hearing and opportunity to confront and cross-examine informants relied upon to deny the clearance. No constitutional issue was decided; the Court simply held that neither Congress nor the President had authorized the Defense Department to establish a program which did not provide for confrontation and cross-examination of persons whose testimony was relied upon by the government. Earlier, in Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935), the Court had held that the requirement of a hearing in revocation of probation was not rooted in the Constitution but upon what Congress provided. Cf. Hannah v. Larche, 363 U.S. 420, 440, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).
 
 
 55
 The relatively narrow thrust of the Greene holding was underscored in the later case of Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), where the Court pointed out
 
 
 56
 "The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest. * * The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. Federal Communications Comm'n v. WJR, 337 U.S. 265, 275-276 [69 S.Ct. 1097, 93 L.Ed. 1353]; Hannah v. Larche, 363 U.S. 420, 440, 442 [80 S.Ct. 1502, 4 L.Ed.2d 1307]; Hagar v. Reclamation District No. 108, 111 U.S. 701, 708-709 [4 S.Ct. 663, 28 L.Ed. 569]. `"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is `compounded of history, reason, the past course of decisions * * *.' Joint Anti-Fascist [Refugee] Comm. v. McGrath, 341 U.S. 123, 162-163 [71 S. Ct. 624, 95 L.Ed. 817] (concurring opinion).
 
 
 57
 "As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. Where it has been possible to characterize that private interest (perhaps in oversimplification) as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required. Oceanic Stream Navigation Co. v. Stranahan, 214 U.S. 320, 340-343 [29 S.Ct. 671, 53 L.Ed. 1013]; State ex rel. Knauff v. Shaughnessy, 338 U.S. 537 [70 S.Ct. 309, 94 L.Ed. 317]; Jay v. Boyd, 351 U.S. 345, 354-358 [76 S.Ct. 919, 100 L.Ed. 1242]; cf. Buttfield v. Stranahan, 192 U.S. 470, 497 [24 S.Ct. 349, 48 L.Ed. 525]. (Footnote omitted.)"
 
 
 58
 Without indulging in semantical exercises as to whether the operation of the parole system gives rise to "rights" or "privileges" in the parolee, we should note that there are obvious factual distinctions between attempted governmental action which destroyed the means of livelihood of an engineer employed by a private contractor and governmental relations with a convicted prisoner released subject to certain conditions before completing a sentence imposed after full due process criminal trial. The very conditions imposed — which are not challenged here — could not be imposed on a person not convicted and under sentence. The United States cannot constitutionally impair a citizen's right to leave the District of Columbia or frequent pool halls, but it can do so to Hyser and the other appellants, whose freedoms have been substantially abridged in accord with the requirements of due process.
 
 
 59
 Access to Board Files: Appellants claim that they are constitutionally entitled to examine the confidential reports made by Parole Officers and the Board's staff. In light of our view of the purpose of parole and of the revocation process, we hold that appellants are not entitled to discovery of the Board's files. See Williams v. People of State of New York, 337 U.S. 241, 250, 69 S.Ct. 1079, 93 L.Ed. 1337.
 
 
 60
 Right to compulsory process: Appellants' next contention is that due process requires that they be afforded compulsory process to procure witnesses. They concede, as they must, that Congress has not invested the Parole Board with subpoena power and that this important power is not an inherent attribute of agency authority. We cannot read it into the statute.[10] As to the constitutional claim, it is sufficient to note that the Parole Board is not bound by the rules of evidence in considering information relating to parole violation. It is the established practice of the Board to consider all communications, i. e., affidavits, letters, telegrams, prison records, even though hearsay in the strict evidentiary sense, in reaching a conclusion. This flexibility affords greater protection to alleged violators than would be allowed in an adversary proceeding with conventional rules of evidence. It permits the Board to consider all relevant information which may be helpful to the parolee. To hold that compulsory process is constitutionally required would imply that revocation hearings are comparable to criminal prosecutions rather than to administrative processes within the framework of prisoner rehabilitation and penal administration. Our treatment and directives relating to the preliminary interview later in this opinion will ameliorate some of the handicaps which confront a parolee upon his arrest for parole violation.
 
 
 61
 As a practical matter we think that in cases where the parolee disputes the acts or conduct relied upon as a parole violation, the question whether there is evidence to support Parole Board action can in the extreme cases be dealt with on judicial review notwithstanding the relatively narrow scope of that review. Moore v. Reid, 100 U.S.App.D.C. 373, 246 F.2d 654 (1957).
 
 
 62
 Obviously resort to the courts will be minimized if before revoking parole the Board discloses to the parolee the maximum amount of information concerning parole violation and the informants relied upon. It must be remembered that cases coming before the courts for review of Board action will involve relatively narrow issues. It can be assumed that where Board action rests on a criminal conviction while on parole, judicial review will be sought infrequently and relief will be granted in only extraordinary circumstances, if ever. This same situation is likely to prevail where the parolee admits the parole violation. Judicial review of Board action with respect to a finding of parole violation is admittedly narrow and limited. Even more limited is judicial review of the Board's judgment as to what it should do about the violation. Once the violation is established or admitted, the exercise of discretion in determining whether or not parole should be revoked, represents a very high form of expert regulatory and administrative judgment and the expert appraisal of the Parole Board in this area can be regarded as almost unreviewable.
 
 II
 
 63
 Viewing the contentions collectively, there emerges a common thread of complaint that a parolee may be arrested for parole violation and returned to a prison far from his authorized place of residence where, in most cases, the alleged violation took place. Distance alone, it is argued, makes it difficult if not impossible to collect information or produce witnesses favorable to the parolee. Additionally it is argued that if there is a substantial time lapse between the arrest and the appearance before the Board, this adds another obstacle to securing information by the parolee. We therefore turn to an examination of the administrative steps leading to and following an arrest for parole violation.
 
 
 64
 Information concerning alleged parole violations may come from various sources including private citizens, police, members of the parolee's family. Compare Parole Board Directive § 2.14, supra at 8488. It may come to the Parole Board, the Attorney General or the Parole Officer. From whatever source, the information leads to an administrative arrest warrant only if it is brought to the notice of the Board by an application for a warrant as provided by Congress. It seems clear that the Board has no inherent power to issue warrants or effect an arrest for retaking and that its powers derive from Congress.[11] To implement the statutory authority, the Board has adopted a regulation which provides: "If a parolee or mandatory releasee violates any of the conditions under which he shall have been released, and satisfactory evidence is presented to the Board, a warrant may be issued and the offender returned to an institution." Parole Board Directive No. 1, § 2.35, 27 Fed.Reg. 8490 (Aug. 24, 1962). See also id. § 2.37 (warrant shall be issued only by the Board or a member thereof.)
 
 
 65
 It seems clear from the statute and the Board's rules that the administrative arrest warrant can issue only on "satisfactory evidence" i. e., on information on which the Board is prepared to rely for that purpose. It is equally clear that in issuing a warrant the Board or its member makes only a tentative or preliminary evaluation finding to the effect that reasonable grounds or cause appears to justify a belief that the parole conditions have been violated.[12] This phase can be analogized to the processes by which a criminal arrest warrant issues although Congress evinced no intent to require precisely the same formalities and safeguards as to those contained in the Constitution for criminal arrests. We are not advised whether the warrant recites the specific parole violations charged. It appears that a conclusory statement of violation of conditions of parole may be what is now provided.
 
 
 66
 When a parolee is taken into custody under a Board warrant he is technically in the custody of the Attorney General and is detained temporarily in an available jail or detention institution and thereafter transported to a federal penitentiary.[13] The length of this temporary incarceration near the place of retaking appears to be determined at least in part by the availability of suitable transportation and custodial officers who transport the parolee. After he is returned to the federal prison the Parole Board grants him an "opportunity to appear." See Glenn v. Reed, supra, and Reed v. Butterworth, supra.
 
 
 67
 The steps surrounding the retaking of a parolee may be summarized as follows:
 
 
 68
 1. Receipt and preliminary evaluation of information of alleged parole violation.
 
 
 69
 2. Application to Board for administrative warrant for retaking and issuance of the warrant.
 
 
 70
 3. Service of warrant, retaking of parolee and temporary detention in available detention quarters.
 
 
 71
 4. Transportation of parolee to a federal prison.
 
 
 72
 5. Preliminary interview with parolee by Board representative.
 
 
 73
 6. Hearing before Board on alleged violation of parole conditions.
 
 
 74
 Fundamentally the Parole Board's interest and its objective are to release a prisoner as soon as he is a good parole risk and to allow him to remain at liberty under supervision as long as he is a good risk. However, in providing for a warrant type of procedure for retaking parolees thought to have violated parole conditions, Congress has recognized the need for some minimal procedural safeguards to prevent or reduce the consequences of the Board's receiving erroneous information or of erroneous action by the Board's representatives.[14]
 
 
 75
 We have noted that the parole of prisoners is one of the chief tools in the rehabilitation process. The procedures for terminating parole are simply an acknowledgement that in granting parole some errors will be made and the errant parolee must be retaken for his own good as well as that of society. The more relaxed are the standards for parole release the greater will be the proportion of such "errors." Congress had a dual purpose in setting up a statutory provision for the issuance of an administrative arrest warrant for parolees: (1) provide a means to retake the parolee and to pursue inquiry into the alleged revocation, and (2) provide minimum safeguards for the parolee. The Board recognized this in its regulations making the issuance of a warrant depend upon the existence of "satisfactory evidence." Parole Board Directive No. 1, § 2.35, 27 Fed.Reg. 8490 (Aug. 24, 1962).
 
 
 76
 It is therefore plain that parole cannot be revoked arbitrarily, as for example to supply the prison with a parolee who is a trained medical technician. Revocation must be for "cause." "Satisfactory evidence" of parole violation must appear. The basis for Board action in revoking parole must have a rational and legitimate relationship to whether the parolee is a good parole risk. What constitutes such cause is left by Congress to the discretion of the Board and judicial review of its exercise is very limited. The functions of the Parole Board involve the application of blended concepts of criminology, penology, and psychology, and if the doctrine of "administrative expertise" should carry weight anywhere it should do so in this area. It is worth repeating that the Board which revokes parole is the same Board which grants parole; its whole orientation is to release prisoners and to keep them at liberty.
 
 
 77
 The entire statutory scheme of parole and the formalizing of the revocation procedures show that Congress intended and the Board has undertaken to establish a retaking process based on concepts of basic fairness. It is the responsibility of the Board — and the courts — to give meaning to this intent. The historic purpose of an arrest warrant in the criminal law context was to interpose between the government and the citizen a neutral official charged with protecting basic rights. This evolved from centuries of experience which demonstrated the need for a neutral evaluation of the reason for an arrest. Since reliable report, even if hearsay, will support a criminal arrest or search warrant against an individual or his property, a fortiori it will support an administrative warrant to retake a convicted prisoner conditionally released by the Parole Board. Compare Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), with cases cited in note 12, supra. See Abel v. United States, 362 U.S. 217, 230-234, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). The parolee at liberty on a conditional release is obviously not in the same posture as an ordinary citizen who has neither charge nor conviction outstanding, but it does not follow that the parolee is without any rights for Congress has given him certain protections.[15]
 
 
 78
 There are three critical stages in the chain of events from the time of a report that a parolee is violating his parole to an ultimate recommitment to serve the remainder of his sentence. The first stage is that some responsible official must evaluate the report of violation and make a tentative estimate which is then reviewed by a Board member before he issues a warrant to retake. Congress has contemplated this procedure and the Board's regulations implement the statute adequately if, as we understand it to be the case, (a) the application for a warrant is made in written form reciting the alleged violations of the parolee which constitute the "satisfactory evidence" for retaking; and (b) that one or more members of the Board exercise independent discretion in determining that the application recites facts, which if true, afford cause or reasonable grounds for a belief that conditions of parole have been violated. The arrest warrant should contain, or have appended to it the application reciting, the reasons why parole revocation is sought with reasonable specificity to inform the parolee of the alleged grounds and enable him to meet and answer them if he so elects. It may be that this information is given to the parolee under existing procedures.
 
 
 79
 The second critical stage is the actual arrest and retaking of the parolee. This event may occur hundreds or in some cases even thousands of miles from the federal prison to which he is to be returned. In a case where he is arrested for departing from his assigned district the arrest may occur at a point far distant from his residence.
 
 
 80
 The Board has wisely provided for a preliminary interview which in context is a first step toward a tentative evaluation of what the parolee wishes to offer by way of explanation of his conduct. We conclude that this preliminary "interview" must, in order to meet standards of fairness inherent in the congressional scheme of parole, be conducted at or reasonably near the place where the alleged parole violation occurred, or the place of the violation chiefly relied upon, and as promptly as is convenient after the arrest while the information is likely to be fresh and the sources are available. Cf. 18 U.S.C. § 3653, supra n. 7.[16]
 
 
 81
 We hold that the preliminary interview should, while informal, be in the nature of a preliminary inquiry held before a person designated by the Board, under 18 U.S.C. § 4207, e. g., the District Probation Officer, at which time the parolee may produce voluntary witnesses to give information relevant to the alleged parole violation specified in the warrant or application for warrant. The designated officer shall hear such persons as may be produced by the parolee in his behalf and record a summary or digest of their statements which bear on the alleged violation.[17] The summary of the interviews and any other material submitted shall be sent forthwith by the local officer to the Parole Board, or to persons the Board may designate, to determine whether there was satisfactory evidence for the issuance of the warrant. If the Board finds satisfactory evidence of parole violation the parolee then may be returned to a federal penitentiary to await final consideration of the proposed revocation of parole. However, if the Board finds there is an absence of satisfactory evidence of parole violation the parolee must be discharged forthwith and restored to his conditional freedom.[18]
 
 
 82
 We do not contemplate that the preliminary interview, or indeed the subsequent appearance before the Board, if there be such, be converted into an adversary proceeding in any sense. Our purpose is no more than to implement what we think Congress meant to provide. While the retaking is not "an arrest within the meaning of the constitutional provisions," Story v. Rives, 68 App.D.C. 325, 97 F.2d 182 (1938), the use of the terms "warrant" and "arrest" by Congress and vesting in the Board the power to issue the warrant satisfy us that something more than casual processes or varying improvisations was intended. Moreover we think this interpretation will tend to simplify the entire process for the supervising parole officer, for the Board and the Attorney General as well as for the courts.
 
 
 83
 While we provide this means to assemble and record information favorable to the alleged parole violator at the time and place it is most likely to be available, we do not intend to preclude the tender of additional information to the Parole Board before the revocation is finally acted upon. Reed v. Butterworth, supra. See also Glenn v. Reed, supra. Nor do we intend to preclude the Board from affording the parolee his opportunity to appear before the Board, at or near the place where the alleged violation occurred, whenever the Board finds that process feasible.
 
 
 84
 To summarize this phase of the holding we emphasize that if the parolee elects to present evidence contesting the alleged parole violation and evidence bearing on his standing as a good parole risk at the time of the preliminary interview, thus combining the return on the warrant with his "opportunity to appear" under § 4207, the Board may in its discretion dispense with a hearing at the prison. However, this would not preclude the Board from considering affidavits or letters submitted after the preliminary interview in support of the parolee's contentions.
 
 
 85
 To meet these standards, which seem at once implicit in the statutory scheme and essential to implement the congressional purpose, the Regulations of the Board must, to the extent necessary, be amended by the Board to provide the following steps:[19]
 
 
 86
 1. An administrative arrest warrant under 18 U.S.C. § 4205 (1958) shall be issued only upon a written application to the Board reciting the facts believed to constitute a violation of a condition or conditions of parole. The Board may in its discretion prescribe the form of such application and designate the persons or officers who may sign it. See Parole Board Directive No. 1, § 2.35, supra, at 8490. If the application for the warrant is based on an alleged parole violation other than a conviction for a violation of law, the application shall contain a statement of the grounds with such specificity as to events, places, dates and names as will enable the parolee to meet the claim that he has violated a condition of parole.
 
 
 87
 2. The warrant shall be issued if one or more members of the Board believe that the facts recited in the application, if true, amount to satisfactory evidence that parole conditions have been violated. Parole Board Directive No. 1, § 2.37, supra at 8490.
 
 
 88
 3. The warrant shall be signed by one or more members of the Board and shall contain a statement of the alleged violations of conditions of parole or alternatively a copy of the application for the warrant may be attached to the warrant. It shall also recite that an officer designated by the Board will interview persons designated by the parolee and record a summary or digest of their statements bearing on the alleged parole violation.
 
 
 89
 4. Upon executing the warrant by taking the parolee into custody, the parolee shall be lodged in a suitable place of detention as near as reasonably possible to the place of parole violation. See Parole Board Directive No. 1, § 2.38, supra at 8490.
 
 
 90
 5. Within a reasonable time thereafter and before the parolee is transported to a federal prison, the officer designated by the Board shall conduct a preliminary interview with the parolee and record a summary or digest thereof. The interviewing officer shall also interview and make a summary or digest of the statements of any other persons who desire to make statements on behalf of the parolee.
 
 III
 
 91
 In Glenn v. Reed, supra, and Reed v. Butterworth, supra, this court held that a parole revocation hearing is invalid if the alleged parole violator is not informed prior to his appearance before the Board of his right to retain counsel and to present voluntary witnesses to the Board. Before those holdings, each appellant in the present appeals had been given an opportunity to appear which was invalid if tested by the standards later enunciated in the Glenn and Butterworth opinions. However, none of the appellants objected at that time to the type of proceeding afforded. Each appellant first raised the objection after the Glenn decision. We have allowed them now to raise the question of the adequacy of the proceeding afforded. We have carefully considered their contentions and except as we now direct modification of the time and place of the procedures following arrest we have not accepted them.
 
 
 92
 Our holding relating to the arrest procedures and scope, time and place for the preliminary interview of an arrested parolee follows from our considered judgment that the statutory scheme developed by Congress over many years intended that some such safeguards be provided and that Congress left it to the Board and the courts to shape such procedures. We have already noted that the Board has gone a long way to give content to the statutes and that what we add now is essentially a matter of drawing together a coherent pattern consistent with what the Board has step by step provided.
 
 
 93
 The basic parole statute has been in existence since 1910, 36 Stat. 820, and all of its editions have contained provisions for retaking of violators on warrant without specifically providing the details of the procedure we now prescribe even though from time to time the Board has evolved additional safeguards and protective devices to implement the statute. Considerations of orderly administration must of necessity enter into this decision. The number of convicted persons on parole is large and the number retaken on administrative warrants is substantial. Balancing the array of competing considerations we are unwilling to hold that prisoners validly convicted, paroled and thereafter retaken should now be set at liberty for want of compliance with steps only now for the first time commanded.[20] See Reed v. Butterworth, supra.
 
 
 94
 Coming to the applicability of these procedures we must recognize that all of these appellants have long since been transported from the place of arrest to a federal prison. When this litigation was commenced appellants could not anticipate the scope of any ultimate holding and we will not penalize them for having refused the type of hearing proffered by the Board. However the posture of the several appellants varies. Those who have not denied the charged violation of parole or any whose parole was revoked because of a criminal conviction would not now be benefited by a hearing which is designed specifically to make a record only in cases where the fact of violation is controverted. Appellant Whitling claims his admission of violation was coerced; appellant Jamison has denied the alleged violation of parole conditions on which revocation was based; while on parole neither was convicted of any criminal charge.
 
 
 95
 As to appellants Whitling, Case No. 16811, and Jamison, Case No. 17059, we remand to the District Court to afford each an opportunity to advise that court what voluntary witnesses each would produce and what information such persons will give bearing on the factual issue of parole violation if a preliminary interview-hearing is held within a reasonable time at or near the place of the alleged parole violation. If it appears to the District Court that such hearing at such place is necessary in order to provide a fair hearing on the alleged parole violation in the circumstances of the particular case, the District Court shall so order.
 
 
 96
 As to appellants Hyser, Case No. 16716, Jatoft, Case No. 16806, Thompson, Case No. 16873, Neiswenter, Case No. 17041, Fitzpatrick, Case No. 17042, and Williamson, Case No. 17043, no useful purpose would be served by such procedure and the judgments appealed from are affirmed without prejudice to the right of each such appellant to have, upon request, the "opportunity to appear" before the Board pursuant to 18 U.S.C. § 4207. We note that the Board has already tendered such opportunity to each of these appellants. This opportunity to appear shall be for the limited purpose of presenting to the Board reasons why the parole violation charged should not operate as a basis for revoking parole.
 
 
 97
 Remanded as to Nos. 16811 and 17059.
 
 
 98
 Affirmed as to Nos. 16716, 16806, 16873, 17041, 17042 and 17043.
 
 
 
 Notes:
 
 
 [1]
 110 U.S.App.D.C. 85, 289 F.2d 462 (1961)
 
 
 [2]
 111 U.S.App.D.C. 365, 297 F.2d 776 (1961). See Barnes v. Reed, 112 U.S. App.D.C. 192, 301 F.2d 516 (1962)
 
 
 [3]
 Through administrative oversight Thompson was not advised of the right to voluntary witnesses until May 1962
 
 
 [4]
 The Declaration of Principles of the American Correctional Association (1960), states:
 "With a few possible exceptions, all offenders released from correctional institutions should be released under parole supervision, and parole should be granted at the earliest date consistent with public safety and the needs of rehabilitation. Decisions pertaining to an individual's parole should be made by a professionally competent board. The type and degree of supervision should be adopted to the needs of the individual offender."
 
 
 [5]
 However, judgment is exercised in determining "good time" credit
 
 
 [6]
 18 U.S.C. § 4207 "Revocation upon retaking parolee
 "A prisoner retaken upon a warrant issued by the Board of Parole, shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board.
 "The Board may then, or at any time in its discretion, revoke the order of parole and terminate such parole or modify the terms and conditions thereof.
 "If such order of parole shall be revoked and the parole so terminated, the said prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced."
 
 
 [7]
 Compare the statutory authority of the Parole Board vis-a-vis parole revocation, 18 U.S.C. §§ 4201-4210, with that of the various District Courts vis-a-vis probation revocation, 18 U.S.C. §§ 3651-3653. Note the breadth of the District Court's authority:
 "As speedily as possible after arrest the probationer shall be taken before the court for the district having jurisdiction over him. Thereupon the court may revoke the probation and require him to serve the sentence imposed, or any lesser sentence, and, if imposition of sentence was suspended, may impose any sentence which might originally have been imposed." 18 U.S.C. § 3653.
 Similarly, the Parole Board, in revoking parole, may require the parolee "to serve all or any part of the remainder of the term for which he was sentenced." 18 U.S.C. § 4207.
 
 
 [8]
 See Moore v. Reid, 142 F.Supp. 481 (D.D.C.1956), rev'd on other grounds, 100 U.S.App.D.C. 373, 246 F.2d 654 (1957)
 
 
 [9]
 See discussion of problems relating to revocation of probation and parole: Hink, The Application of Constitutional Standards of Protection to Probation, 29 U.Chi.L.Rev. 483 (1962); Weihofen, Revoking Probation, Parole or Pardon without a Hearing, 32 J. of Crim.L. & Criminology 531 (1941)
 
 
 [10]
 See I Davis, Administrative Law Treatise § 303 (1958)
 
 
 [11]
 18 U.S.C. § 4205 provides:
 "A warrant for the retaking of any United States prisoner who has violated his parole, may be issued only by the Board of Parole or a member thereof and within the maximum term or terms for which he was sentenced. The unexpired term of imprisonment of any such prisoner shall begin to run from the date he is returned to the custody of the Attorney General under said warrant, and the time the prisoner was on parole shall not diminish the time he was sentenced to serve."
 The present section 4205 is an amalgamation of former §§ 717 and 723c of Title 18. Section 717 provided that a warrant may issue only upon "reliable information." The merger of the two sections occurred in the 1948 recodification of Title 18. The reviser's notes indicate that the omission of the words "reliable information" was probably a drafting oversight. There is no express reference of congressional intent that would indicate that the change was intentional.
 
 
 [12]
 The holdings on this score are limited. With one exception, the cases we have found which discuss the question of the requirements of cause upon which the warrant may issue arose under the old statutory language of 18 U.S.C. §§ 717, 723c. United States ex rel. De Lucia v. O'Donovan, 82 F.Supp. 435 (N.D.Ill. 1948), aff'd 178 F.2d 876 (7th Cir. 1949), appeal dismissed. 340 U.S. 886, 71 S.Ct. 204, 95 L.Ed. 643 (1950), on remand for hearing on the merits, 107 F.Supp. 347 (N.D.Ill.1952); Story v. Rives, 68 App. D.C. 325, 97 F.2d 182 (1938); Christianson v. Zerbst, 89 F.2d 40 (10th Cir. 1937). In Hiatt v. Compagna, 82 F. Supp. 295 (N.D.Ga.1948), rev'd, 178 F.2d 42 (5th Cir. 1949), aff'd by an equally divided court, 340 U.S. 880, 71 S.Ct. 192, 95 L.Ed. 639 (1950), the Fifth Circuit, obiter dictum, said "There is nothing in the present statute, of force since September 1, 1948, requiring that the warrant be based on `reliable information' as stated in former Title 18, Section 717."
 
 
 [13]
 18 U.S.C. § 4206 provides that the arresting officer "shall execute such warrant by taking such prisoner and returning him to the custody of the Attorney General." See Parole Board Directive No. 1, § 2.38, 27 Fed.Reg. 8490 (Aug. 24, 1962)
 18 U.S.C. § 4082 provides:
 "Persons convicted of an offense against the United States shall be committed, for such terms of imprisonment as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences shall be served.
 "The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the Federal Government or otherwise, or whether within or without the judicial district in which the person was convicted.
 "The Attorney General may order any inmate transferred from one institution to another. * * *"
 
 
 [14]
 In the fiscal year 1960, the Board issued 1,016 warrants for arrest of parole violators and 670 warrants for the arrest of mandatory release violators. Ann. Rep't of the Attorney General of the United States 428-430
 During the fiscal year ending June 30, 1960, the Parole Board held 12,640 hearings of all types, of which a substantial number were violator hearings. Ann. Rep't of the Attorney General of the United States 416 (1960).
 
 
 [15]
 In Story v. Rives, 68 App.D.C. 325, 331, 97 F.2d 182, 188 (1938), this court had occasion to note that "A warrant issued for the retaking of a [parolee] * * * proceeds upon an entirely different premise and serves a different purpose than in the case of a warrant for the arrest of a person charged with the commission of a crime. A released prisoner is not a free man. * * * Consequently, it cannot be said that the retaking of a prisoner who is already within the legal custody of the authorities constitutes an arrest within the meaning of the constitutional provisions."
 
 
 [16]
 The arresting officer is presently authorized to confine the parolee temporarily in a local jail while awaiting transport to the prison from which he was released
 
 
 [17]
 There is no requirement in the statutes or regulations that such persons be sworn to testify under oath and we do not intend to require it. Since sworn written statements may be filed there is plainly no bar to receiving information under oath if the witness is willing
 
 
 [18]
 The Parole Board may, of course, elect to delegate authority to the local officer who conducts the interview to evaluate the evidence before him and decide whether there is an absence of satisfactory evidence of parole violation and empower him to discharge the parolee when there is not. Under 18 U.S.C. § 3655 (1958), "Each probation officer shall perform such duties with respect to persons on parole as the Attorney General shall request." By Department of Justice Order 271-62, § 0.126(b), 27 Fed.Reg. 5172 (June 1, 1962), the Attorney General has delegated this authority to the Parole Board. See also 18 U.S.C. § 4207
 
 
 [19]
 We are aware that some of the steps here provided are already followed by the Board but we now state them fully to place the whole process in orderly sequence
 
 
 [20]
 The dissenting views may be summed up, as we see them, as calling for (a) an adversary proceeding on parole revocation with virtually all the incidents of a criminal prosecution except a Grand Jury at the threshold and a jury of twelve to pass on the facts (view of Judges Bazelon and Edgerton), and (b) a hearingbefore arrest (view of Judges Fahy and Wright). As to the second proposal — a hearing before arrest — this would raise the arrest of a convicted person then under sentence to a higher plane and afford him more protection than the Constitution gives citizens who stand convicted of no crime. We see nothing in the statutes or the Constitution which supports such an interpretation and indeed the appellants have not claimed they were entitled to a hearing before arrest. Judge Fahy's arguments as to taking arrested parolees great distances to prisons where they must await the Board's convenience are met by the procedures we now prescribe. Were these dissenting views to prevail parole revocation could well become so complicated and so difficult that the entire parole system and its desirable objectives would suffer.
 
 
 
 99
 WASHINGTON, Circuit Judge (concurring).
 
 
 100
 I have joined in Judge Burger's opinion because I believe it represents an important step forward, yet does not impose requirements so onerous as to endanger the fulfillment of the salutary objectives for which Congress has created the Board of Parole. Parole is an important part of the rehabilitative process for most prisoners, and its availability should not be restricted by the imposition of unreasonable conditions on its administration. On the other hand, revocation of parole can have extremely serious consequences for the individual affected, and, therefore, the processes whereby revocation is effected should and must live up to certain minimal notions of fairness to the individual. The problem of the courts is to balance these desiderata, within the statutory and constitutional framework, whenever it appears that they may be in conflict.
 
 
 101
 What follows is intended to give such additional support as I can to the conclusions reached in Judge Burger's opinion. As I read his opinion, it recognizes the right of the parolee in a revocation proceeding to an opportunity to be heard at a geographical location that affords him a reasonable opportunity to set forth any evidence he has bearing upon the question whether he has violated a condition of parole, and whether parole should be revoked. At the same time, the opinion holds that there is neither statutory authorization nor constitutional necessity for other procedures to which appellants claim they are entitled, to wit: appointed counsel, compulsory process to obtain the presence of witnesses, and confrontation and cross-examination in all cases of persons giving information to the Board. I will here give the reasoning that leads me to concur in these results.
 
 
 102
 The right to a hearing at a reasonable geographic location derives, in Judge Burger's view, from the nature of the proceeding whereby the parolee is returned to custody. I do not disagree with the view that some form of hearing may be required on the return of a warrant. I think, in fact, that the statute and the judicial gloss heretofore placed on it demand the result now reached. Section 4207 of Title 18 requires the Board to afford the parolee "an opportunity to appear," and we have heretofore held that this opportunity to appear, in order to be an effective one and to represent a real protection of the parolee, embodies a right to bring retained counsel, Glenn v. Reed, 110 U.S.App.D.C. 85, 289 F.2d 462 (1961), and voluntary witnesses, Reed v. Butterworth, 111 U.S. App.D.C. 365, 297 F.2d 776 (1961). If the hearing is held in a Federal penitentiary many hundreds or even thousands of miles from the parolee's residence or from the place where the alleged violation occurred, the rights recognized by the Glenn and Butterworth decisions become little more than a dead letter except for the parolee with some financial means. In my view, therefore, the opportunity to appear required by Section 4207 must be given — as Judge Burger's opinion says — in a geographical location selected so as not to interfere with the exercise of the rights we have heretofore recognized. At such a hearing, the parolee should be permitted — if he desires — to show that he did not violate the conditions of his parole, and to offer evidence designed to persuade the Board to allow him to remain on parole. This approach may offer some administrative advantages. By combining the opportunity to appear with the hearing on the return of the warrant, as I think Congress intended, we de-emphasize to a large extent the hearing at the prison (although this may still be given at the discretion of the Board). The hearing at the prison heretofore granted was often of little benefit to the parolee — at least as compared to a fuller hearing at the time and near the place where he is apprehended.
 
 
 103
 It does not follow from the above that parolees are also entitled to the other relief appellants request. The rights recognized in Glenn, Butterworth, and this case are different in important respects from the other relief sought. In each instance to date, the essence of the right recognized involves the opportunity for the parolee fully and intelligently to present his side of the story, whether as to the facts surrounding an alleged violation or as to considerations that might influence the Board's dispositional determination. I believe that Congress, in providing for an opportunity to appear, sought to give the parolee a suitable forum in which to plead his cause — a meaningful proceeding, to be sure, but still an informal one. In my view, we cannot read into the statute the further requirements that appellants ask us to impose. These would transform revocation proceedings into full-dress adjudicatory hearings, with the Board put to its proof in every case. Congress clearly did not envision these proceedings as prosecutions in the traditional sense, and I do not understand it to be the proper role of the courts to work such radical changes unless constitutional considerations of a compelling nature appear. For the reasons given by Judge Burger, I do not find such considerations present here.
 
 
 104
 BAZELON, Chief Judge, and EDGERTON, Circuit Judge (concurring in part and dissenting in part).
 
 
 105
 Appellants allege that the hearings offered by the Board fall short of statutory and constitutional requirements because they do not include inter alia: (1) an opportunity to confront and cross-examine the witnesses and inspect the documents the Board relies on to establish parole violations; and (2) appointment of counsel for parolees who cannot afford to retain counsel.
 
 
 106
 Ordinarily, perhaps, our view of these claims should await their disposition by the Board in the newly offered hearings. But the Government asserts that they will be denied. Further delay in the already protracted controversies would therefore impose unnecessary hardship on the Board as well as the appellants. Accordingly our decision of the issues raised by appellants is requested.
 
 
 107
 * Before we can decide what procedural safeguards must accompany any proceeding, we must consider the nature of the determinations which are to result from that proceeding. As we read the statutes, at least two distinct determinations must be made before parole is revoked. The first is whether the arrested or retaken parolee has violated a specifically charged condition of his parole. If he has not, he must be permitted to remain at liberty, regardless of any predictive judgment regarding his dangerousness.[1] The second determination is whether, if a violation is found, it warrants modification or revocation of parole.[2]
 
 
 108
 The two determinations differ fundamentally in nature. The first is factual and retrospective, involving no discretion or expertise. The second is prospective, involving a high degree of discretion, expertise and even educated guess. Congress recognized this distinction by providing for different methods of making the two determinations. The decision whether a condition was violated may be made by "the Board, a member thereof, or an examiner designated by the Board" after the retaken prisoner has been "given an opportunity to appear * * *." 18 U.S.C. § 4207. The dispositional decision — what to do about the violation — may be made only by "the Board * * * in its discretion," and the statute does not seem to contemplate a hearing on this issue.
 
 II
 
 109
 We now describe, in general terms, the procedures pursuant to which we think the different determinations should be made. We do not discuss the procedure to be followed in issuing an administrative arrest warrant. Our discussion assumes that the parolee has been arrested, incarcerated in a local jail, and informed of the violation charged.
 
 
 110
 A. If the parolee does not deny the violation, or if he has been validly convicted of a crime which constitutes the violation, we think an informal interview should be held to permit him to explain the violation, and to submit any documents or voluntary testimony bearing on his general character and probable future behavior that he wishes the Board to consider in its dispositional determination. Since the occurrence of the violation is not in dispute, the interview does not require safeguards which attend factual determinations. The Government need not introduce evidence, and representation by counsel need not be permitted.
 
 
 111
 B. If the parolee denies the violation and has not been validly convicted of a crime which constitutes the violation, he must be given a suitable hearing to determine whether the violation occurred. The Government should be required to produce all the evidence relied upon to prove the violation, and the parolee must of course be permitted to produce all his evidence tending to disprove it. He should also be permitted to introduce any evidence for the Board's consideration in the dispositional decision which must be made ultimately if the violation is found.
 
 
 112
 These hearings[3] must be held before "the Board, a member thereof, or an examiner designated by the Board," and in a location reasonably near the source of the relevant information.[4]
 
 
 113
 If the Government fails to establish the charged violation, the parolee must be released. If he does not deny, or a valid conviction establishes, or the examiner reasonably finds, that the charged violation occurred, the record of the hearing should be sent to the Parole Board which may consider all the material it deems relevant and must decide, in the exercise of its expert discretion, whether to revoke, modify or leave unchanged the parolee's limited freedom.
 
 III
 
 114
 We now consider whether the relevant statutes and constitutional provisions guarantee the traditional safeguards of confrontation and cross-examination of the witnesses and inspection of the documents relied on by the Board to establish a violation. The parolees in these cases who have admitted or been convicted of acts constituting the charged violations have, in our opinion, had adequate hearings. No questions have been raised concerning the Board's dispositional determinations. We therefore discuss only the hearings offered those parolees who have denied and have not been convicted of acts constituting the charged violations, and only that aspect of the hearings which relates to the alleged occurrence of the violation.
 
 
 115
 In Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), appellant had been denied security clearance after an administrative hearing in which he was denied "the traditional procedural safeguards of confrontation and cross-examination."[5] Before examining in detail the nature and purpose of the hearing, the Court considered whether denial of these protections by an administrative agency was of questionable constitutionality. In concluding that it was, the Supreme Court said:
 
 
 116
 "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right `to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases [citing cases], but also in all types of cases where administrative and regulatory actions were under scrutiny. [Citing cases.]"[6]
 
 
 117
 Having decided that the action of the administrative agency raised constitutional questions, the Court said it would not pass on them unless it was "clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use."[7] The Court required more than implicit "acquiescence or nonaction."[8]
 
 
 118
 "[Such decisions] must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized * * * but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them."[9]
 
 
 119
 The Court found that the required specific authorization was lacking. It made clear that this procedure must be followed in all cases of constitutional doubt, "even in areas where it is possible that the Constitution presents no inhibition."[10]
 
 
 120
 We must deal with appellants' constitutional claims in the light of the foregoing principles. The Government argues that the Parole Board's denial of appellants' request to confront and cross-examine those who informed the Board of alleged parole violations raises no substantial constitutional question. It cites, inter alia, Fleming v. Tate, 81 U.S.App. D.C. 205, 156 F.2d 848 (1946), where we said that "[n]o constitutional right is involved, as parole is a matter of grace." Although the doctrine that "matters of grace" can give rise to no constitutional questions may have been supportable under the authorities available in 1946, we think it conflicts with later Supreme Court pronouncements. Some of the most important and far-reaching of the Court's recent constitutional decisions have involved matters which would formerly have been considered "of grace." See, e. g., Greene v. McElroy, supra; Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); and cases cited in Greene, 360 U.S. at 492, 79 S.Ct. at 1411.
 
 
 121
 The elements of due process vary with the nature of the proceeding, but there can be no doubt that the requirement of due process applies to every type of Government proceeding. As the Supreme Court recently said:
 
 
 122
 "`Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account."[11]
 
 
 123
 This leaves no doubt in our minds that the Parole Board's denial of the traditional safeguards of confrontation, cross-examination and inspection raises serious constitutional questions.[12]
 
 
 124
 A parole revocation seems to us more like a "binding [determination] which directly affect[s] the legal rights of individuals" than "a general fact-finding investigation." It seems to follow that the traditional safeguards are required. But we need not — indeed we may not — undertake to decide this complex constitutional question until we are certain that Congress has explicitly undertaken to authorize the Parole Board to conduct revocation hearings without the safeguards of confrontation, cross-examination and inspection. No such explicit authorization is claimed. We must therefore conclude that the Parole Board has no authority to conduct parole revocation proceedings without these traditional safeguards.
 
 
 125
 The majority makes several arguments against the right of confrontation, cross-examination and inspection at parole violation hearings. It argues first that these rights should not apply because they do not apply in probation revocation the most "comparable" legal proceeding. But no specific violation of a condition need be found in order to revoke probation. See, e. g., Kaplan v. United States, 234 F.2d 345 (8th Cir. 1956). Probation may be revoked solely on the basis of predictive judgments about likely future behavior. See, e. g., Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932). Such judgments do not require the same safeguards as determinations of specific past acts. That certain rights do not apply to probation revocation may have some relevance to the question of what rights apply to the second parole revocation determination, i. e., the disposition that should be made of the parole violator, but has no relevance to the determination whether the parolee violated a specific condition of his parole.
 
 
 126
 The same may be said of the majority's second argument that because a state judge may use "out-of-court information to assist him in the exercise" of his discretion in sentencing, Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the traditional safeguards do not apply to parole violation hearings. A sentencing judge does not have to find specific facts on which to rest the sentence.[13] The facts which authorize him to impose sentence have already been found in a trial at which the accused is fully protected. The trial judge has only to make a dispositional determination, a decision similar to that which the Parole Board makes after it is determined that a parolee has violated his parole. As the Supreme Court said in Williams: for a trial judge before verdict the issue is whether a defendant is guilty of "having engaged in certain criminal conduct of which he has been specifically accused. * * * A sentencing judge, however, is not confined to the narrow issue of guilt. His task * * * is to determine the type and extent of punishment after the issue of guilt has been determined." 337 U.S. at 246-247, 69 S.Ct. at 1082-1083.[14] Williams v. New York therefore militates in favor of, rather than against, the parolee's right to confrontation, cross-examination and inspection of the sources relied upon to establish the "conduct of which he has been specifically accused."
 
 
 127
 The majority also argues that protections required in an "adversary" process should not be required in a parole revocation proceeding, which is not "an adversary proceeding in the usual sense," because there is "a genuine identity of interest if not purpose" between the parolee and the Board. "In a real sense the Parole Board in revoking parole occupies the role of parent withdrawing a privilege from an errant child not as punishment but for the misuse of the privilege." But whatever general philosophy underlies parole revocation, when the Board tells a parolee that he has done a specific act for which his parole may be revoked, and he denies it, there are "adverse, conflicting objectives," not "genuine identity of interest," at least in regard to the specific issue in dispute. Our consideration of the way to resolve this dispute cannot end with an assertion that it does not exist.
 
 
 128
 We would hold that unless the parolee does not deny the violation charged or has been validly convicted of a crime constituting the charged violation, he must be given an opportunity to confront and cross-examine all witnesses and inspect all documents on which the Government relies to prove the violation.
 
 IV
 
 129
 We turn next to the question whether, because parolees who can afford to hire counsel may be represented at parole revocation hearings, parolees unable to afford counsel have a right to appointed counsel at such hearings. Here again we are considering only the hearing at which it is sought to establish an alleged violation.
 
 
 130
 In 1946 we construed the District of Columbia Code provision that parolees "shall be given an opportunity to appear before [the Parole] Board" as requiring "an effective appearance" which "necessarily means the presence of counsel."[15] Congress soon amended the Code to provide specifically that a parolee "may be represented by counsel."[16] In 1957[17] we reversed a determination by the Board that a parolee who had not been advised of his right to representation waived it by failing to ask for counsel. In holding that the right could not be waived except by "`intentional relinquishment or abandonment' of that `known right or privilege,'"[18] we pointed out why representation by counsel is imperative and approved the statement of the trial court in the Tate case, supra, note 15, that "the right of counsel is no less important in an administrative hearing on a revocation of parole, than it is in a judicial proceeding."[19] In 1959 we upheld a parolee's right to counsel under the Federal statute whose language, "an opportunity to appear," was almost identical with the language of the D.C.Code when we construed it in 1946.[20]
 
 
 131
 The present case is the first in which we are called upon to decide whether the right to be represented at a parole revocation hearing applies to a parolee who cannot, as well as to one who can, afford to hire counsel. In the recent case of Reed v. Butterworth[21] we declined to "express an opinion" on whether the right is "limited to counsel retained or otherwise secured by [parolee]," because this was "not in issue" in that appeal.[22] Some earlier opinions contain statements to the effect that appointment of counsel for indigents is not required. But since all of those cases involved parolees who, as far as appears, were able to retain counsel, the statements are dicta and not controlling here. Therefore we must now decide whether the reasons which convinced us that Congress, in requiring a hearing, intended representation for a parolee who can afford to retain counsel, apply also to one who cannot.
 
 
 132
 That Congress did not specifically provide for appointment of counsel should not lead us to conclude that such appointment was not intended. In the absence of an explicit statement either way, we should not impute to Congress an intent to discriminate between parolees unable to afford counsel and others in similar danger of losing their freedom. If, as we have repeatedly held, the serious consequences of parole revocation make the right to counsel so critical that Congress must be deemed to have intended it as part of a required hearing, Congress must be deemed to have intended it for all.[23]
 
 
 133
 Furthermore, were we to construe the statutory grant of the right to counsel as intended only for those who can pay, substantial constitutional questions would arise.[24] Although the Federal Government is not directly limited by an "equal protection of the laws" clause, the Supreme Court has held that "discrimination [by the Federal Government] may be so unjustifiable as to be violative of due process."[25] The Supreme Court has repeatedly held that in criminal trials, discrimination "on account of poverty" is as unjustifiable as discrimination "on account of religion, race, or color," because it "bears no rational relationship to a defendant's guilt or innocence." Griffin v. Illinois, 351 U.S. 12, 17-18, 76 S.Ct. 585, 589-590, 100 L.Ed. 891 (1956). Poverty bears no more relationship to the question of parole violation than to the question of guilt. Therefore congressional discrimination against parolees who cannot afford counsel would raise serious problems of due process of law. To avoid such problems we should construe the statute to provide for the appointment of counsel for such parolees. Cf. Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).[26]
 
 V
 
 134
 Appellants also argue that so long as the Board maintains that compulsory process is unavailable, it must, at least, either hold the hearing in a district reasonably calculated to facilitate the voluntary appearance of parolees' witnesses, or else defray the reasonable costs of securing such witnesses where the parolee is unable to pay for their appearance. Since the majority agrees that a hearing must be held in a district reasonably calculated to facilitate the voluntary appearance of parolees' witnesses, we do not discuss this issue.
 
 VI
 
 135
 Briefly, the gist of our position in these cases upon the foregoing matters is as follows:
 
 
 136
 I. Parole may not be revoked unless it is established, by failure to deny, conviction or administrative determination, that a specific charged condition of the parole has been violated.
 
 
 137
 A. If a retaken parolee denies the charged violation and has not been validly convicted of an offense constituting the violation, an issue of fact arises which must be resolved pursuant to administrative hearing.
 
 
 138
 1. At this hearing the parolee must have an opportunity to cross-examine all witnesses and examine all documents relied on by the Board to establish the violation.
 
 
 139
 2. He must also be permitted to introduce whatever voluntary evidence relating to his general character and likely future behavior he wishes the Board to consider when it makes its dispositional decision in the event that the violation is established.
 
 
 140
 3. The hearing must be held within a reasonable time after the retaking of the parolee and at a location reasonably near the source of most relevant information.
 
 
 141
 4. Since retained counsel is permitted at such a hearing, counsel must be assigned to represent those who cannot afford to retain counsel and who request such aid.
 
 
 142
 B. If a retaken parolee does not deny the charged violation or has been validly convicted of an offense constituting the violation, an informal interview should be held.
 
 
 143
 1. At this interview the Parole Board need introduce no evidence for cross-examination or inspection, but the parolee may introduce whatever voluntary evidence relating to his general character or likely future behavior he wishes the Board to consider when it makes its dispositional decision.
 
 
 144
 2. The interview must be held reasonably near the source of most relevant information.
 
 
 145
 3. Counsel need not be permitted at this interview.
 
 
 146
 II. Once it is established, either by failure to deny, conviction or administrative determination, that a violation has occurred, the Board itself must decide whether to revoke the parole, modify its conditions, or leave the situation unchanged. If it decides to revoke, it must decide how much of his remaining sentence the parolee should be required to serve. The Board has wide discretion in deciding what disposition to make of a parole violator, and may generally rely on whatever information it deems relevant without disclosing its nature or source to the parolee.
 
 VII
 
 147
 We would resolve the specific cases before us in the following manner:
 
 
 148
 Appellants Thompson (No. 16873), Neiswenter (No. 17041), and Fitzpatrick (No. 17042) have admitted or been convicted of acts constituting the charged violations. Since they do not challenge the dispositional determination, no relief would be appropriate under our view.
 
 
 149
 Appellant Jamison (No. 17059) denies each of the violations with which he is charged. Had he not been arrested on these charges, he would now be out of the custody of the Attorney General since his original sentence would have expired on July 21, 1960. We would therefore order his immediate release. See Glenn v. Reed, 110 U.S.App.D.C. 85, 289 F.2d 462 (1961).
 
 
 150
 Appellant Jatoft (No. 16806) and Williamson (No. 17043), in effect, deny the violations with which they were charged but would still be in the custody of the Attorney General, even if they had not been arrested on parole violators warrants. We would require therefore that they immediately be afforded the hearings we have described.
 
 
 151
 The records are unclear as to appellants Hyser (No. 16716) and Whitling (No. 16811). Hyser would be out of the custody of the Attorney General but for his alleged parole violation. The record, however, does not show whether he admitted or was convicted of an act constituting a charged violation. Whitling was not convicted of an act constituting a charged violation. The record, however, does not show whether he would still be in the custody of the Attorney General but for his alleged violation. Nor does it show whether his "admission" of the violation was coerced as he claims, or freely made, as the Board claims. We would therefore remand these two cases to the District Court for determination of those issues and dispositions in accordance with the principles we have set forth.
 
 
 
 Notes:
 
 
 [1]
 The majority agrees that parole cannot be revoked unless there is a determination that the parolee has violated a specifically charged condition of his parole. (See, e. g., pp. 234, 240, 243.)
 The Government seems to argue that, although the Board, as a matter of policy, will not revoke parole absent a violation, the statute and the Constitution leave it free to do so. We disagree. The relevant statutes clearly seem to contemplate violation of a specifically charged condition of parole as requisite to revocation. See 18 U.S.C. § 4205.
 Moreover, as the Government states in its brief in Neiswenter (p. 33): "Under the parole statutes a retaken parolee suffers a penalty for his violation. While, in the absence of a violation, the time he is out on parole is credited towards his sentence, a violation tolls the running of the sentence . . . and the warrant, if timely and validly issued, may be executed after the original expiration date of the sentence." Thus if parole is revoked, the parolee's sentence — the period of time during which he is in the custody of the Attorney General — is actually increased. The Supreme Court has recently said that "[w]hile [parole] is an amelioration of punishment, it is in legal effect imprisonment." Anderson v. Corall, 263 U.S. 193, 196, 44 S.Ct. 43, 44, 68 L.Ed. 247 (1923); quoted in Jones v. Cunningham, 371 U.S. 236, 242 note 17, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963).
 The Constitution would not permit an increase in a parolee's sentence without a determination that he has committed some new wrong against which he had been specifically warned. See Ex Parte Lange, 18 Wall. 163, 85 U.S. 163, 172, 21 L.Ed. 872 (1873). Cf. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). It follows that a violation must be established before the Board may revoke parole and bring this penalty provision into operation. And there is no indication that Congress did not intend this. See Note, 72 Yale L.J. 368, 378 (1962); Wright v. Settle, 293 F.2d 317 (8th Cir. 1961) ("The basis under which the statutes allow the Board to act is the existence of a violation of the conditional release or parole." Id. at 318.)
 
 
 [2]
 If the Board decides to revoke, it must also determine how much of his remaining sentence the parolee should be required to serve
 
 
 [3]
 In providing that a retaken parolee "shall be given an opportunity to appear," the statute does not explicitly provide for different types of hearings depending on whether the occurrence of the violation is in dispute. But it is reasonable to assume that Congress intended the hearings to be suited to the nature of the inquiry
 
 
 [4]
 If the violation is in dispute, the hearing should be reasonably near the place of the alleged violation; whereas if the violation is not in dispute, the hearing should be reasonably near the parolee's parole district, which would usually be the source of most relevant information about his general character and likely future behavior
 
 
 [5]
 360 U.S. at 493, 79 S.Ct. at 1411
 
 
 [6]
 360 U.S. at 496-497, 79 S.Ct. at 1413
 
 
 [7]
 360 U.S. at 507, 79 S.Ct. at 1419
 
 
 [8]
 Ibid
 
 
 [9]
 Ibid
 
 
 [10]
 Id. 360 U.S. at 508, 79 S.Ct. at 1419. In the Greene case the Court found no explicit authorization of the questioned denials of safeguards and therefore reversed appellant's security revocation
 In Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), the Court followed the same procedure, finding there that Congress had explicitly authorized the questioned denials of confrontation and cross-examination in fact-finding hearings before the Commission on Civil Rights, and holding that because of the exclusively investigatory nature of the Commission, the due process clause did not require those procedural safeguards. And in Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court also followed this procedure, finding explicit authorization for the commanding officer summarily to withdraw a cook's permission "to work at one isolated and specific military installation," and holding that, since the action "would in [no] way impair [her] employment opportunities anywhere else" and since it was not based on any specific finding of fact, the due process clause did not require a hearing.
 
 
 [11]
 Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960)
 
 
 [12]
 See Fleenor v. Hammond, 116 F.2d 982, 132 A.L.R. 1241 (6th Cir. 1941); Weihofen, Revoking Probation, Parole or Pardon without a Hearing, 32 J. of Crim. L. & Criminology 531 (1941)
 
 
 [13]
 Moreover, the Court pointed out that "The accuracy of the statements made by the judge as to appellant's background and past practices was not challenged by appellant or his counsel, nor was the judge asked to disregard any of them or to afford appellant a chance to refute or discredit any of them by cross-examination or otherwise." 337 U.S. 244, 69 S.Ct. at 1081. Here we are concerned with parolees who do challenge the accuracy of factual determinations and do seek a chance to refute or discredit them
 
 
 [14]
 The majority say that we equate parole processes with criminal prosecution, disregarding the philosophy of parole revocation and the question whether the rights of confrontation, cross-examination and inspection would result in "gain to the parolee or to society." The majority appears to assume that because the question, whether or not the "protections" of confrontation, cross-examination and inspection are appropriate in parole violation hearings, involves such broad considerations of policy, the question should first be decided by Congress, after full and careful evaluation of empirical data and competing values. We agree with this assumption. Because Congress has not given the matter such consideration, or explicitly decided that the procedural safeguards should be withheld, we think the Board should not withhold them. See Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed. 2d 1307 (1960). If Congress decided that they should be withheld, the decision would of course carry great weight. But precisely because decisions affecting the traditional safeguards are so crucial and involve such broad policy considerations, they should not "be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them." Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377 (1959). This is what the majority decision does. It sustains administrative practices of doubtful constitutionality without contending that Congress has explicitly undertaken to authorize them. Cf. Comment, Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts, 71 Yale L.J. 760 (1962); Bickel & Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 Harv.L.Rev. 1 (1957); Borrow v. Federal Communications Comm., 109 U.S.App.D.C. 224, 228, 285 F.2d 666, 670 (dissenting opinion of Judge Washington), cert. denied, 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188 (1960)
 
 
 [15]
 Fleming v. Tate, 81 U.S.App.D.C. 205, 206, 156 F.2d 848, 849 (1946). We also held that "an effective appearance * * * necessarily means * * * the receipt of testimony if [the parolee] has testimony to present." Ibid
 
 
 [16]
 See D.C.Code, § 24-206
 
 
 [17]
 Moore v. Reid, 100 U.S.App.D.C. 373, 376, 246 F.2d 654 (1957)
 
 
 [18]
 We were here quoting from Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), which held that "The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." 304 U.S. at 463, 58 S.Ct. at 1022
 
 
 [19]
 100 U.S.App.D.C. at 374, 246 F.2d at 655
 
 
 [20]
 Robbins v. Reed, 106 U.S.App.D.C. 51, 269 F.2d 242 (1959). We there noted that the "amendment * * * enacted subsequent to Fleming v. Tate * * * does not militate against our construction of the federal statute which has not been made explicit in this respect, for in Fleming v. Tate we construed the local statute to permit representation by counsel before the amendment, when in all essential respects the District of Columbia Code was worded as the federal statute is now worded." 106 U.S.App. D.C. at 53 n. 2, 269 F.2d at 244 n. 2. The Government in this case correctly assumes "that the federal and District of Columbia statutes are to be construed identically with respect to the right of counsel." Appellees' brief in Hyser v. Reed, p. 18, n. 12
 
 
 [21]
 111 U.S.App.D.C. 365, 297 F.2d 776 (1961)
 
 
 [22]
 111 U.S.App.D.C. at 366 n. 1, 297 F.2d at 777 n. 1
 
 
 [23]
 Cf. Address by Attorney General Kennedy, American Bar Association, Aug. 6, 1962 (Department of Justice Press Release) at pp. 4-7, concerning representation of indigents
 
 
 [24]
 The majority makes two arguments against the proposition that the appointment of counsel may now be constitutionally required in parole revocation hearings. It claims that "In Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962), the Supreme Court did not place an indigent's right to counsel * * * in judicial proceedings on any command of the Constitution, but more narrowly on its interpretation of a statute, 28 U.S.C. § 1915." But the Supreme Court said in that case that "we have been impelled by considerationsbeyond the corners of 28 U.S.C. § 1915, considerations that it is our duty to assure to the greatest degree possible, within the statutory framework * * *, equal treatment for every litigant before the bar." Id. 369 U.S. at 446-447, 82 S.Ct. at 921-922, emphasis supplied.
 The majority points out that "No case has yet held that an interested party in an administrative or regulatory proceeding is entitled to be furnished with counsel if he cannot afford one of his own choice." The majority does not point out that there has never been an authoritative pronouncement that one unable to afford counsel is not entitled to assigned counsel at such proceedings. That there is a paucity of cases raising this issue probably results from the fact that in immigration proceedings, which form the bulk of administrative actions affecting the poor, there are voluntary organizations which stand ready to represent any party in danger of serious deprivation. It is not a valid argument against the existence of the right.
 
 
 [25]
 Bolling v. Sharp, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)
 
 
 [26]
 It may not be within the judicial province to appoint counsel in administrative hearings. But this does not affect our duty to decide whether the right to appointed counsel is created either by statute or by the Constitution. See e. g., Powell v. Alabama, 287 U.S. 45, 60, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932), where the Supreme Court apparently recognized that it was powerless to appoint counsel to appear in Alabama state courts, but concluded that this does not affect "[t]he question * * * which it is our duty, and within our power, to decide * * * whether the denial of the assistance of counsel contravenes the due process clause * * *."
 See also Report of the Attorney General's Committee on Poverty and the Administration of Justice (Feb. 25, 1963), 120, 115, where the distinguished Committee urged "strongly that the right to counsel at parole revocation hearings" cannot fairly be confined to those financially able to purchase it and that the "situation as it has now developed gives rise to serious inequity * * *" and said: "As a practical matter, it has been doubted that the Board has or can properly be given authority to require attorneys to provide representation in these cases and it has been questioned whether the courts possess authority to appoint counsel to serve in administrative hearings, like the parole revocation proceedings. Without attempting to resolve these issues, the Committee points out that the adoption of a plan of adequate representation in the federal courts * * * would make a significant contribution to the problem of representation before the Board. There can at least be no doubt that Congress might properly authorize the federal public defender to assume the obligations of such representation in those districts that elect the public defender system. It is clear, however, that the Department needs to give further consideration, not only to the problem of supplying counsel, but to the other elements of fair hearing in the revocation proceedings." [Id. at 116-17.]
 
 
 
 152
 FAHY, Circuit Judge, with whom Circuit Judge J. SKELLY WRIGHT joins (concurring in part, dissenting in part).
 
 
 153
 I am in agreement with the guiding principles set forth by Judge Burger in his opinion for the majority of the Court. My dissent is in the application of those principles to the operation of the parole system under the existing statutes. My views, however, are not intended as an attack upon the majority opinion but, since I largely agree with its approach, as a statement of an affirmative position on the several matters necessary to a decision of the appeals.
 
 
 154
 The Board is not a judicial body. Perhaps it is best described as administrative and supervisory. It administers and supervises a part of the penal system, with special responsibility for its rehabilitative and ameliorative features. The Board's responsibility begins after a person has been convicted of a criminal offense and has had the rights and protections pertaining to the administration of the criminal law. In paroling such a person the Board is not conducting an adversary proceeding. There is no suggestion from any quarter that the procedures for granting parole are comparable to those of an adversary character.
 
 
 155
 A change in relationship between Board and individual occurs after parole has been granted and a question as to its violation arises; but this change in relationship does not extend to transforming the Board into an adversary of the parolee. This is so even though an alleged crime is said to be the violation. For a violation of parole is not a crime. A loss of parole status, which had relieved the prisoner of the need to serve in full his original sentence, may result, but when the Board takes up the problem of violation it is still engaged in administering or supervising a sentence. It is not engaged in a proceeding which leads to a sentence.
 
 
 156
 Personal liberty, however, is involved in proceedings incident to an alleged violation of parole. For this reason the proceedings must conform with due process of law. But due process of law varies widely with circumstances. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). It is one thing in a prosecution for crime. It is another in administering the parole system. In some aspects of the parole system due process of law is like that applicable to the revocation of probation, the nature of which is explained in Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L. Ed. 266 (1932), or to sentencing, reviewed in Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). And see Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L. Ed. 1566 (1935). The Board must obey applicable legislation but otherwise it seems to me the Board is required only to perform its functions fairly under fair procedures. It may not act unreasonably or arbitrarily.
 
 
 157
 With the above in mind we consider first the statute. With respect to a parole violation the requirements of the statute are divided into three main parts:
 
 
 158
 I. Section 4205, 18 U.S.C., provides that a warrant for the retaking of a parolee "who has violated his parole" may be issued by the Board or a member thereof. A warrant is not required to be issued. A violation may be overlooked. And this statutory language requires a finding of violation before a warrant is issued and the parolee retaken. This is the plain reading of the language and no reason appears to depart from its plain reading. Compare, in contrast, the Virginia statute discussed by the Court in Jones v. Cunningham, 371 U.S. 236, 83 S. Ct. 373, 9 L.Ed.2d 285 (1963). In giving our statute this meaning I bear in mind that if the alleged violation is the commission of a crime — a positive harm to the community — the parolee may be arrested under ordinary procedures and prosecuted. The community has this protection. There is accordingly no policy reason for failing to read Section 4205 as requiring a finding of violation before a parolee is arrested and retaken under authority of the Board. Depriving a person of his parole liberty is not a substitute for prosecution for crime, with its protections of the Bill of Rights.
 
 
 159
 The statute does not prescribe the procedure for finding a violation. But since the Due Process Clause requires a fair procedure, commensurate with the nature of the problem, we read into the statute such a procedure. So doing I would require before a violation can be found, unless it is admitted, or evidenced by proof of conviction of an offense which also constitutes a parole violation, that the parolee be given a hearing after he has had notice of the claim of violation. At the hearing he should have the opportunity to be heard in person and to present witnesses, to bring counsel to assist him, and to have access to, and, on request, confrontation, of the sources of information as to the alleged violation, with right of cross-examination. See Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). This hearing should ordinarily be in the District where the violation occurred if the parolee so desires, and should be as near to the place of occurrence as is reasonably possible, if this is requested; that is, the hearing is to be at a place reasonably convenient to enable the parolee fairly to meet the claim. And in order that a proper review of these proceedings may be made by the Board or member in deciding whether to issue a warrant for retaking the parolee the officer conducting the hearing should preserve a record of what witnesses were present, along with a summary of their testimony and with a notation of the requests made by the parolee and their disposition. It is upon this record that a finding of violation is to be made, unless admitted or established by proof of a conviction. At this hearing the parolee may also introduce evidence, see No. III, infra, bearing upon the discretion of the Board in event a violation is found.
 
 
 160
 II. When a violation has been found upon the basis of an admission, or upon proof of conviction of an offense which constitutes a violation, or as the result of the suggested type of hearing, and only then, a warrant may issue by the Board or a Board member under Section 4206 and the parolee may be retaken.[1] The issuance of a warrant, however, and the retaking, are discretionary.
 
 
 161
 III. After arrest and retaking the prisoner is given a statutory opportunity under Section 4207 to appear before the Board. This appearance has to do with the discretionary action to be taken by the Board as a consequence of the violation. The finding of a violation itself, previously made, may also be reconsidered at this later stage in the discretion of the Board, on the record made under the procedure set forth above; and if additional evidence is offered, there is the right of confrontation and cross-examination. At this appearance under Section 4207 the parolee may, as this court has previously held,[2] have counsel and present witnesses. The communication and clerical facilities of the Government should also be made available to the prisoner to a reasonable degree to enable him to obtain and present to the Board in addition to his own statements and the testimony of any witness he has present, such statements, credentials, testimonials, and affidavits, as may bear upon the discretionary action the Board is empowered to take as a consequence of the violation.
 
 
 162
 The Board is not required to revoke the parole; it may revoke and terminate it, or it may modify the terms and conditions of the parole. It may also require the prisoner to serve only a part of the remainder of the term for which he was sentenced. 18 U.S.C. § 4207.
 
 
 163
 In all the above the Board, from the very beginning and through each step must act on behalf of the parolee as well as in the public interest. Counsel, though permitted, I think is not in these circumstances the touchstone of due process, either traditionally or rationally. With the Board and its agents having the duty of functioning in the interest of the individual in a supervisory capacity, the touchstone of due process is freedom from arbitrariness and abuse of discretion, with fair and impartial procedures for obtaining the information upon the basis of which to make decisions, the fairness of the procedure being considered in terms of the consequence of the decision to be made. This consequence may be that the parolee is obliged to serve the balance of a sentence which had been previously imposed in a criminal proceeding governed by the applicable provision of the Bill of Rights.
 
 
 164
 The impact of a parole violation is upon a conditional personal liberty. This is not the same as the impact on liberty of a trial for crime. While due process is required, this does not as a rule for parole violation call for a procedure broken down into the right to have counsel appointed, or to have compulsory process. If, however, these appear in a particular case to be essential to the reaching of a fair and reasonable result by the Board the Board may not validly act without them. Ordinarily this is not the situation. Perhaps it is of some use to add that the action of the Board is subject to judicial review, with counsel appointed for an indigent if requested, and with compulsory process also available.
 
 
 165
 Applying these standards to the pending cases I review them under the following guides:
 
 
 166
 1. If violation of parole has not been denied by a plaintiff in his pleadings, I now treat the violation at this state of these cases as though factually admitted. In these instances, unless the hearing with respect to revocation, modification or discretionary action after arrest has conformed with the views above expressed, such hearing and reconsideration I think should now be accorded, if requested.
 
 
 167
 2. If the violation of parole is denied, and it is not now clear that the finding of violation, followed by warrant and arrest, is supported by proof of a conviction, or if it is not clear that the Board has conformed substantially with the procedures I have outlined, my view is that the prisoner should be released and the Board, if so advised, may proceed de novo.
 
 
 168
 It appears and is admitted by the Board that in the Jamison case the parolee has consistently protested his innocence of a violation, has offered witnesses who would or could testify to pertinent events, and has preserved his objections for our consideration. Since he has not been accorded the procedures I now find were due him, I think he is being illegally held and should be restored to freedom. Furthermore, it appearing that his sentence would have run out in July, 1960, when but for this retaking he would have presumptively been on parole, his restoration to freedom should be unqualified. Since the retaking was improper his incarceration since that time should be considered for present purposes as if he were never retaken and his parole had continued uninterruptedly to the expiration of his sentence. See Glenn v. Reed, 110 U.S.App.D.C. 85, 289 F.2d 462 (1961), where freedom was restored as the only proper remedy for a wrongful retaking, though the court did not take occasion to consider the matter of credit for time already spent on parole.[3]
 
 
 169
 The other cases, with one exception to be noted, are seen to be ones of an admitted parole violation, the question remaining being one of discretionary treatment after the retaking and so they fall under Number 1 above. Accordingly these plaintiffs must be given an opportunity to have an appearance before the Board of the character set out above. The Board then will be in a position to exercise its judgment as to whether any of these appellants should be remitted to parole, and if so under what conditions, and whether if the parole in any case is revoked all or only some of the remaining time should be served.
 
 
 170
 The exception is the case of Whitling. It does not appear that he freely made an admission to the charge of parole violation. There are allegations (in his rejected offer to amend his complaint) of threats and coercion against him in connection with a statement apparently relied upon by the Board. From this record we are unable to pass upon the merits of his defenses. It is not apparent that the Board considered them. I disagree with the District Court's finding that this appellant "had admitted violating the conditions of his parole." Accordingly, as I see it, he ought to be released, but without prejudice to the Board proceeding de novo in his case.
 
 
 171
 Finally, in regard to Jatoft, where there is an assertion of innocence both at the court level and before the Board, it must be said that his contentions were considered by the Board and there was sufficient evidence to support a finding of a violation in the absence of any proffer by him of testimony or witnesses to support his contention that he did not know the persons with whom he was associating were involved in a criminal operation. Of course the post-violation retaking procedures should be complied with in this case.
 
 
 
 Notes:
 
 
 [1]
 The majority opinion, note 20, says that in this manner we raise the arrest of a parolee who has been convicted of crime to a higher plane than the Constitution accords persons only accused of crime. This overlooks the many safeguards attaching to one arrested for crime. He is entitled to speedy arraignment with advice as to his rights, including the right to counsel, and he is ordinarily entitled to his liberty on bail bond. There is a separation of the arresting function from that of detention, and the magistrate reviews the adequacy of the basis for the arrest. Persons currently retaken on a Board warrant, however, may be and often are transported great distances to a federal prison where they must await the visit of a Board member before their cases are considered. In the meantime such a person is cut off from family, friends, and employer. His situation is not comparable to that of a person arrested on an ordinary warrant for possible criminal prosecution, with the protections of the Constitution and Federal Rules of Criminal Procedure. The majority's treatment of the problem — arrest followed by local incarceration and then a hearing — is an improvement over the present practice but does not afford the solution a plain reading of the statute requires. No Constitutional objection to such a solution is suggested. Moreover, rather than complicating and making more difficult the parole system and its desirable objectives, as the majority opinion suggests, we believe acceptance of our approach would not adversely affect the salutary purposes of the system nor make its operations more difficult than will the plans adopted by the majority
 
 
 [2]
 Robbins v. Reed, 106 U.S.App.D.C. 51, 269 F.2d 242 (1959)
 
 
 [3]
 We distinguish the facts here from those in Fitzpatrick, a companion case, where it is also argued that a sentence has run if credit be given for time spent on parole. The difference is that in Fitzpatrick the violation is admitted and so the case falls within the others to be dealt with below
 
 
 
 172
 J. SKELLY WRIGHT, Circuit Judge (concurring in part and dissenting in part).
 
 
 173
 The court's opinion outlines a major advance in the protection of personal liberty in the administration of the parole system. While I concur[1] in that opinion in all respects insofar as it provides additional safeguards for the protection of the parolee, with Judge Fahy I would go further. These further safeguards are possible within the present statutory framework, do not add obligations so onerous as to discourage a liberal parole policy, and, in my judgment, are required for compliance with the current concept of due process as applied to parole revocation proceedings.
 
 
 174
 1. Since 18 U.S.C. § 4205 provides for the retaking of a parolee "who has violated his parole," I would have a hearing before that determination is made and the warrant issued. The hearing should be non-adversary and relatively informal, with the rules of evidence relaxed as indicated in the court's opinion.
 
 
 175
 2. After being served a copy of the charges against him as outlined in the court's opinion, I would have a probation officer[2] appointed to assist in his defense if he denies the charges and is not represented by counsel. See 18 U.S.C. § 3655 authorizing the Attorney General to assign probation officers "duties with respect to persons on parole."
 
 
 176
 3. Since neither the Parole Board nor the Attorney General has authority to compel the attendance of witnesses, those witnesses for the parolee who prefer not to appear at the hearing should be interviewed by a probation officer and summaries of the interviews filed in evidence.
 
 
 177
 4. I would extend to the parolee the right of confrontation. Compare Greene v. McElroy, supra, Note 1, 360 U.S. at 496-497, 79 S.Ct. at 1413.
 
 
 178
 The extension to the parolee of these additional safeguards will not paralyze the parole process. Where serious violations of parole have been committed, the parolee will have been arrested by local or federal authorities on charges stemming from those violations. Where the violation of parole is not serious, no reason appears why he should be incarcerated before hearing. If, of course, the parolee willfully fails to appear for his hearing, this in itself would justify issuance of the warrant.
 
 
 179
 With reference to confrontation, this right is basic to fairness in any type of hearing where personal liberty is involved. What has already been so well said about "faceless informers" needs no repetition by me. See, e. g., dissenting opinion of Mr. Justice Douglas in Draper v. United States, 358 U.S. 307, 314-325, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See also Donnelly, Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs, 60 Yale L.J. 1091 (1951).
 
 
 
 Notes:
 
 
 [1]
 I also concur in most of what is so well stated in the excellent opinion of Judges Bazelon and Edgerton. With me, however, the primary attribute of a good parole system is a liberal parole policy. Requiring a full-dress second trial, even limited to questions of fact, would, in my judgment, militate against such a policy. Rights to assigned counsel and compulsory process in revocation proceedings are obviously desirable, but the price in terms of the number of persons paroled, or, more accurately, not paroled, may be too high. For the time being I would accept the non-adversary hearing with a probation officer assisting the parolee. As stated in the text, I believe that such protection conforms with the current concept of due process and it is possible within the statutory framework. Compare Greene v. McElroy, 360 U.S. 474, 507-508, 79 S.Ct. 1400, 3 L. Ed.2d 1377 (1959)
 
 
 [2]
 A probation officer ordinarily is a graduate in social work whose experience in the rehabilitation of offenders and exposure to court proceedings uniquely fit him understandingly to assist parolees in these informal hearings. It is true that probation officers are also used to supervise persons on parole and, in that capacity, sometimes initiate revocation proceedings. But a probation officer's duties, and his training, are never prosecution oriented. The fact that he may be a parole supervisor in one case should not disqualify him, in another case, from helping the parolee in preparing his defense, interviewing his witnesses, and generally assisting him at the non-adversary hearing